**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RIPARIUS VENTURES, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | Civil Action Nos.  07-CV-3063 and 07- |
| | ) | CV-6121 |
| v. | ) | |
| | ) | |
| ASCALADE COMMUNICATIONS, INC., | ) | Judge John W. Darrah |
| LOGITECH INTERNATIONAL S.A., | ) | Presiding Magistrate Judge Schenkier |
| KONINKLIJKE PHILIPS ELECTRONICS | ) | |
| N.V., U.S. ROBOTICS and CISCO | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |
| | ) | |

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR PROPOSED CLAIM CONSTRUCTION**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     THE ANATOMY OF A PATENT.........................................................................2

III.    THE LAW OF CLAIM CONSTRUCTION...........................................................4

        A.      General Principles of Claim Construction.............................................4

        B.      Claim Construction of Means-Plus-Function Limitations .....................6

IV.     OVERVIEW OF THE PATENTS-IN-SUIT ........................................................9

        A.      Plain Old Telephone Service ("POTS")................................................9

        B.      Overview of the Technology of the Patents-in-Suit ...........................10

        C.      Prosecution History of the '481 Patent ...............................................14

        D.      Prosecution History of the '371 Patent ...............................................14

V.      CLAIM CONSTRUCTION OF THE NECESSARY LIMITATIONS OF
        PATENTS-IN-SUIT............................................................................................16

        A.      "remote cordless telephone handset" and "remote cordless base
                unit"....................................................................................................16

        B.      "circuitry for translating audio information input to said
                microphone to an rf signal as an input to said handset rf
                transceiver".........................................................................................18

        C.      "circuitry for translating a keypress on said dialpad into a DTMF
                tone as in input to said handset rf transmitter" ...................................19

        D.      "said remote cordless telephone base unit connected to a
                computer".............................................................................................22

        E.      "means for determining whether said communication represents a
                DTMF signal or audio information" ....................................................25

        F.      "means for transmitting signals between said base unit rf
                transceiver and said computer"............................................................29

        G.      "said software is compatible with telephony software utilized by
                Internet telephony providers so as to allow emulation of a cordless
                POTS telephone call over the Internet" ..............................................32

        H.      "circuitry for translating a keypress on said dialpad into data
                representing said keypress as an input to said handset rf
                transceiver".........................................................................................35

        I.      "means for determining whether said communication represents
                data representing a keypress or audio information" ............................36

J.    "a computer having a direct connection to a digital telephony network" ................................................................................................38

K.    "rf transceiver for communication with a base unit" and "said rf transceiver means" ....................................................................41

L.    "providing ready status" ..............................................................41

VI.    CONCLUSION ........................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003)................................................................5

*Aquatex Industries, Inc. v. Techniche Solutions*,
    419 F.3d 1374 (Fed. Cir. 2005)................................................................6

*Aristocrat Technologies Australia (ATA) v. International Gaming Tech.*,
    86 U.S.P.Q.2d 1235 (Fed. Cir. 2008) ................................................8, 27

*Atmel Corp. v. Info. Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)................................................................8

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
    501 F.3d 1274 (Fed. Cir. 2007)........................................................28, 38

*Bancorp Services, L.L.C. v. Hartford Life Insurance Co.*,
    359 F.3d 1367 (Fed. Cir. 2004)..............................................................25

*B. Braun Med. Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997)..........................................................7, 25

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,
    55 F.3d 615 (Fed. Cir. 1995)....................................................................4

*Biomedino, LLC v. Waters Technologies Corp.*,
    490 F.3d 946 (Fed. Cir. 2007)...........................................................8, 26

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir.)........................................................................5

*C & F Packing Co. v. IBP, Inc.*,
    916 F. Supp. 735 (N.D. Ill. 1995; *Lampi, LLC v. Am. Power
    Prods., Inc.*, 65 F. Supp. 2d 757 (N.D. Ill. 1999)...............................16

*CCS Fitness v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)................................................................5

*Depuy Orthopaedics Inc. v. Androphy*,
    53 U.S.P.Q.2d 1941 n. 3 (N.D. Ill. 2000) ...............................................3

*E.I. Du Pont De Nemours & Co. v. Monsanto Co.,*
    903 F.Supp. 680 (D. Del. 1995) ............................................................................3

*Generation II Orthotics, Inc. v. Med. Tech., Inc.,*
    263 F.3d 1356 (Fed. Cir. 2001) ............................................................................6

*Glaxo Wellcome, Inc. v. Andrx Pharm., Inc.,*
    344 F.3d 1226 (Fed.Cir.2003) ............................................................................5

*Johnston v. IVAC Corp.,*
    885 F.2d 1574 (Fed. Cir. 1989) ............................................................................7

*JVW Enters. v. Interact Accessories, Inc.,*
    424 F.3d 1324 (Fed. Cir. 2005) ............................................................................7

*Lampi, LLC v. Am. Power Prods., Inc.,*
    65 F. Supp. 2d 757, 761 (N.D. Ill. 1999),
    *aff'd in part, vacated in part on other grounds,*
    228 F.3d 1365 (Fed. Cir. 2000) ............................................................................16

*LG Electronics, Inc. v. Bizcom Electronics, Inc.,*
    453 F.3d 1364 (Fed. Cir. 2006) ....................................................................6, 20

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) ............................................................................4

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB,*
    344 F.3d 1205 (Fed. Cir. 2003) ....................................................8, 9, 25, 26, 27, 41

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.,*
    248 F.3d 1303 (Fed. Cir. 2001) ....................................................................8, 26, 41

*Micro Chem., Inc. v. Great Plains Chem. Co.,*
    194 F.3d 1250 (Fed. Cir. 1999) ............................................................................6

*Microsoft v. Multitech Systems,*
    357 F.3d 1340 (Fed. Cir. 2004) ....................................................................32, 40

*Oakley, Inc. v. Sunglass Hut Int'l,*
    316 F.3d 1331 (Fed. Cir. 2003) ............................................................................25

*Optical Disc Corp. v. Del Mar Avionics,*
    208 F.3d 1324 (Fed.Cir.2000) ............................................................................5

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................................4, 5, 17, 20

*R2 Medical Systems, Inc. v. Katecho, Inc.*,
931 F.Supp. 1397 (N.D. Ill. 1996)................................................................3

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998)................................................................4

*Smiths Industries Medical Systems, Inc. v. Vital Signs, Inc.*,
183 F.3d 1347 (Fed. Cir. 1999)................................................................7

*Springs Window Fashions LP v. Novo Industries LP*,
323 F.3d 989 (Fed. Cir. 2003)................................................................5

*Valmont Indus., Inc. v. Reinke Mfg. Co.*,
983 F.2d 1039 (Fed. Cir. 1993)................................................................6, 41

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)................................................................4

*Wahpeton Canvas Co. v. Frontier, Inc.*,
870 F.2d 1546 (Fed. Cir. 1989; *Lampi*, 65 F. Supp. 2d at 761) ......................................16

*WMS Gaming, Inc. v. International Game Technology*,
184 F.3d 1339 (Fed. Cir. 1999)................................................................9

**Statutes**

35 U.S.C. § 112................................................................ 6, 7, 25, 36, 41

I.    **INTRODUCTION**

In accordance with the Court's Scheduling Order, Defendants Logitech International S.A., U.S. Robotics, and Cisco Systems, Inc. ("Defendants") submit their proposed claim construction of the disputed claim terms found in U.S. Patent No. 7,016,481 ("the '481 patent") (attached hereto as Ex. B) and U.S. Patent No. 7,139,371 ("the '371 patent") (attached hereto as Ex. C).

The '481 patent and the '371 patent (collectively referred to as the "patents-in-suit") are both titled "Remote Internet Telephony Device." The '371 patent is a continuation of the '481 patent, and both patents-in-suit have essentially the same specifications and drawings. The telephone device described in the patents-in-suit is for emulating a Plain Old Telephone Service ("POTS") call over a digital telephony network. The patents-in-suit describe a cordless telephone handset and base unit combination, with the base unit being in wired communication with a personal computer ("PC"), which in turn is connected to the Internet. In operation, a user presses number keys on the keypad of the telephone handset to dial a telephone number. Pressing number keys on the keypad causes circuitry within the handset to generate DTMF (the abbreviation for the well-known "touch tone" protocol "dual tone multi frequency") tones, which are a combination of high tones and low tones for conveying information about which a number on a keypad has been pressed. The DTMF tones are sent to the handset transceiver, which then sends the DTMF tones to the base unit. The base unit transmits the DTMF tones to the PC, which contains software that processes the DTMF tones to emulate a POTS call over the Internet.

Below is a brief description of the background of the technology and the patents-in-suit, followed by a detailed analysis construing the disputed claim limitations. Defendants' proposed constructions provide the Court with the plain and ordinary meaning of the disputed claim terms

as would have been understood by a person of ordinary skill in the art at the time of the alleged invention. Defendants' proposed claim constructions are supported by the plain language of the claims, the specifications, the file histories and, extrinsic evidence, including expert testimony and industry standards. In addition, to aid the Court's understanding of the technology, the patents-in-suit, and the Defendants' proposed claim constructions, an animated tutorial is submitted herewith as Ex. A.

## II.  THE ANATOMY OF A PATENT

A patent includes two basic parts, a written description of the invention and the patent claims. The written description, which may include drawings, is often referred to as the "specification" of the patent.

As shown in Illustration 1, the cover page of the patent provides identifying information, including the **date the patent issued** and **patent number** along the top, as well as the **inventors' names**, the **filing date**, the **assignee**, and a list of the **prior art publications** considered in the Patent Office when the patent was applied for.



**Illustration 1 – '481 Patent (Ex. B)**

The specification of the patent begins with an abstract, found on the cover page. The abstract is a brief statement about the subject matter of the invention.

Next, are the drawings, which appear as "Figures" or "Figs." The drawings depict various aspects or features of the invention. They are described in words later in the patent specification. The written description of the invention appears next. In this portion of the patent,

2

each page is divided into two columns, which are numbered at the top of the page. The lines on each page are also numbered. The written description of the patent begins at column **1**, line **1**. The written description includes a background section, a summary of the invention, and a detailed description of the invention, including some specific examples.

The specification ends with one or more numbered sentences. These are called the claims. The claims may be divided into a number of parts or steps, referred to as "claim limitations." The claims in the patent describe the various inventions of the patent and set forth the metes and bounds of the patent.

As shown in Illustration 2, a claim generally contains three parts: the **preamble**, the *transition phrase*, and the **body**. *Depuy Orthopaedics Inc. v. Androphy*, 53 U.S.P.Q.2d 1941, 1954 n. 3 (N.D. Ill. 2000); *E.I. Du Pont De Nemours & Co. v. Monsanto Co.*, 903 F.Supp. 680, 693 (D. Del. 1995). The preamble is the



**Illustration 2 – Claim 1 of '481 patent (Ex. B)**

introductory phrase shown before the transition phrase. *Depuy Orthopaedics*, 53 U.S.P.Q.2d at 1954; *R2 Medical Systems, Inc. v. Katecho, Inc.*, 931 F.Supp. 1397, 1434 (N.D. Ill. 1996). The transition phrase connects the preamble to the body of the claim. *Depuy Orthopaedics*, 53 U.S.P.Q.2d at 1954; *E.I. DuPont.*, 903 F.Supp. at 693. The body of the claim lists the limitations that define the invention. *Id.*

## III.     THE LAW OF CLAIM CONSTRUCTION

### A.     General Principles of Claim Construction

Claim construction is an issue of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction begins with and focuses on the words of the claim. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995). The starting point of patent claim construction is to give the disputed terms their ordinary and customary meaning. This is the meaning the terms would have "to a person of ordinary skill in the art in question at the time of the invention . . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

In attempting to determine the ordinary meaning of claim terminology, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314. "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.*

"Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.'") *Id.* at 1315. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In its watershed *en banc* decision in *Philips*, the Federal Circuit court quoted its decision in *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998), to emphasize the critical importance of the specification:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips,* 415 F.3d at 1316.

The patent's prosecution history should also be considered because "[l]ike the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. A patentee must be held to what he/she declares during the prosecution of the patent, and others are entitled to rely on those representations in determining the scope of the patent. *See, e.g., Springs Window Fashions LP v. Novo Industries LP*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").

Testimony by a witness, who is recognized by the court as an expert in the field of the invention, about the common meaning of a technical term at the time the application was filed, is instructive in ascertaining its meaning. *See Phillips,* 415 F.3d at 1318; *Glaxo Wellcome, Inc. v. Andrx Pharm., Inc.,* 344 F.3d 1226, 1229 (Fed.Cir.2003); *Optical Disc Corp. v. Del Mar Avionics,* 208 F.3d 1324, 1334 (Fed.Cir.2000).

Dictionaries, encyclopedias and treatises may also be helpful in determining the meaning of claim terminology as they are "'objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those of skill in the art.'" *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1089 (Fed. Cir. 2003). The general meanings gleaned from reference sources such as dictionaries, however, must always be compared against the use of the terms in context in the intrinsic record. *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir.). Courts may rely on dictionary definitions when construing claim terms, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Finally, courts may also

rely on industry standards or regulations when construing claim terms as such extrinsic evidence can be probative of industry-wide accepted meanings for terms at issue. *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1375 (Fed. Cir. 2006); *Aquatex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1381-82 (Fed. Cir. 2005).

**B.    Claim Construction of Means-Plus-Function Limitations**

A means-plus-function limitation is one in which a patent applicant expresses the limitation as a "means" for performing a function without having to recite structure, materials, or acts in the limitation. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1041-42 (Fed. Cir. 1993). This Court must construe a means-plus function limitation according to 35 U.S.C. § 112, ¶ 6, which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim *shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof*.

35 U.S.C. § 112, ¶ 6 (emphasis added). Interpreting a means-plus-function claim limitation according to § 112, ¶ 6 requires two steps: (1) determining the claimed function; and (2) determining the structure described in the specification which corresponds to that function.

The first step in construing a means-plus-function limitation is determining the function of the means-plus-function limitation. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). The function stated in the "means-plus-function" claim element is a specific limitation and must be interpreted literally in a literal infringement analysis. When construing the function of a "means-plus-function" limitation, the Court may not construe a means-plus-function limitation "by adopting a function different from that explicitly recited in the claim." *Micro Chem.*, 194 F.3d at 1258; *see Generation II Orthotics, Inc. v. Med. Tech., Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001) ("When construing the functional statement in a means-

plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim.").

The next step is determining the corresponding structure described in the specification. *Id.* When construing the structure of a "means-plus-function" limitation, the Court must identify in the patent specification the structure that is clearly associated with performing the claimed function. *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005). Because the word "means," "if read literally, would encompass any means for performing the function . . . section 112 ¶ 6 operates to <u>cut back</u> on the types of <u>means</u> which could literally satisfy the claim language." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989) (emphasis in original). The *quid pro quo* for the convenience of employing the means-plus-function form pursuant to § 112, ¶ 6 is the patentee's duty to link or associate structure disclosed in the specification with the function recited in the claim. *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Thus, "structure disclosed in the specification is 'corresponding' structure <u>only</u> if the specification or prosecution history <u>clearly links or associates</u> that structure to the function recited in the claim." *Id.* (emphasis added).

To this end, when construing means-plus-function claims, the Court should identify as corresponding only the specific structures actually described in the specification, as opposed to broader, but undisclosed *categories* of such structures. *Smiths Industries Medical Systems, Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1357 (Fed. Cir. 1999) (affirming construction of corresponding structure as being limited only to a specific "double-entry squeezebag" described in the specification, and not "a generic squeezebag").

Accordingly, a structure in the specification that is not linked to the recited function cannot be considered corresponding structure even if that structure is capable of performing the

recited function.  *See, e.g.*, *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1216 (Fed. Cir. 2003) (reversing district court's interpretation of means-plus-function claim because "there is no evidence that one of skill in the art would perceive a clear link between [the alleged corresponding structure] and the [claimed] function"), *cert. denied*, 124 S. Ct. 1715 (2004); *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001) (finding structure disclosed in the specification not to be corresponding structure to means-plus-function limitation because the specification failed to clearly link or associate the structure to the claimed function, despite finding that the disclosed structure was capable of performing the claimed function).

Further, "interpretation of what is disclosed in the specification must be made in light of the knowledge of one skilled in the art." *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).   "[T]he corresponding structure of the limitation 'must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation.  Otherwise, one does not know what the claim means.'" *Id.* (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999).   "The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure." *Id.* at 953 (citations omitted).

Also, with respect to computer implemented means-plus-function claims, the patent specification must disclose "more than simply a general purpose computer or microprocessor." *Aristocrat Technologies Australia (ATA) v. International Gaming Technology*, 86 U.S.P.Q.2d 1235, 1239 (Fed. Cir. 2008).  Said the Federal Circuit:

> For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that

function amounts to pure functional claiming.

*Id.* The Federal Circuit also explained that a computer oriented application using means-plus-function claims must "at least disclose the algorithm that transforms the general purpose microprocessor to a 'special purpose computer programmed to perform the disclosed algorithm.'" *Id.* at 1243, quoting *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).

Finally, in situations where a specification describes structure corresponding to a claimed function and describes other structure that is associated with other functions, it is improper to include the other structure as additional structure corresponding to the claimed function of the means-plus-function limitation. *See Medical Instrumentation and Diagnostics Corporation v. Elektra AB*, 344 F.3d 1205, 1216 (Fed. Cir. 2003).

## IV.   OVERVIEW OF THE PATENTS-IN-SUIT

### A.     Plain Old Telephone Service ("POTS")

The prior art to the patents-in-suit includes telephone devices used to communicate by voice over the public switched telephone network ("PSTN"). Telephone calls over the PSTN are generally referred to as Plain Old Telephone Service ("POTS") calls. Ex. D, Declaration of Dr. Maggs, ¶ 10.

The basic components of a cordless POTS telephone device include a telephone handset and a base unit. *Id.* at ¶ 11. The telephone handset has several components, including a microphone for a user to speak into, a speaker for the user to hear audio communications, and a handset keypad. *Id.* The telephone handset communicates with the base unit via radio frequency signals, commonly referred to as RF signals. *Id.*

In operation, a user presses number keys on the keypad to dial a telephone number. *Id.* at ¶ 12. Pressing number keys on the keypad causes circuitry within the handset to generate dual

tone multi frequency tones. *Id*. Dual tone multi frequency tones are commonly referred to as DTMF tones. *Id*. A DTMF tone is a combination of one high tone and one low tone for conveying information about which a number on a keypad has been pressed. *Id*. For example, each key on the keypad has a unique DTMF tone that is generated when the key is pressed by the user. *Id*. The handset transmits the DTMF tone to the base unit via RF signals. *Id*. The base unit then conveys the DTMF tones over an audio



Excerpt from Ex. A

pathway to a Central Office. *Id*. The Central Office detects the DTMF tones within the audio pathway, and based on the DTMF tones received, the Central Office routes the telephone call to a specific phone in the system. *Id*. To ensure proper detection by the Central Office of the PSTN, the DTMF tone must comply with a Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23). *Id*.

The users can then conduct their telephone conversation by speaking into the microphone of the telephone handsets. *Id*. at ¶ 13. Their voice signals are transmitted over the same audio pathway in which the audible DTMF tones were transmitted. *Id*. The users are able to hear each others' voices though the speakers contained in the telephone handsets. *Id*.

**B.   Overview of the Technology of the Patents-in-Suit**

U.S. Patent No. 7,016,481 ("the '481 patent") is titled "Remote Internet Telephony Device." Ex. B, '481 patent. U.S. Patent No. 7,139,371 ("the '371 patent") is also titled "Remote Internet Telephony Device." Ex. C, '371 patent. The '371 patent is a continuation of the '481 patent and has the same written description and drawings as the '481 patent.

The telephone device described in the patents-in-suit is for emulating a POTS call over a digital telephony network.  The patents-in-suit describe a cordless telephone handset and base unit combination, with the base being in wired communication with a personal computer ("PC"), which in turn is connected to the Internet.  Fig. 3 from the patents-in-suit is illustrative, and an annotated version of Figure 3 is reproduced below.



The specifications of the patents-in-suit explain that the "remote Internet Telephony appliance . . . consists of a PC 100, [c]ordless handset base unit 105 and a cordless handset 107."  Ex. B, '481 patent, col. 3, line 1-4.  As shown in Figure 1, the PC is connected to the Internet.  *Id*. at Fig. 1.

As shown in Figure 4 of the patents-in-suit (excerpt of figure shown below), the remote cordless telephone handset has several components, including a microphone (420) for the user to speak into, a speaker (430) for the user to hear audio communications, a DTMF keypad and internal circuitry (307) for generating DTMF tones when a user presses a keypress on the

keypad, and a radio frequency transceiver (401) for wireless communication with the remote base unit. Ex. B, '481 patent, Fig. 4; Ex. D, Declaration of Dr. Maggs, ¶ 17.



Figure 4 also shows that the base unit has several components, including a radio frequency transceiver (451) for wireless communication with the telephone handset, and circuitry (460, 470, 480) for relaying audio information received from the handset to the personal computer. Ex. B, '481 patent, Fig. 4; Ex. D, Declaration of Dr. Maggs, ¶ 18. The base unit connects to the PC (100) via a sound card and an input/output ("I/O") port. Ex. B, '481 patent, col. 1, line 53-56; Ex. D, Declaration of Dr. Maggs, ¶ 19. An annotated excerpt from Figure 4 illustrating the connection between the base unit and the PC is shown below:



The connection to the sound card allows audio signals, such as voice communication and DTMF tones to be transmitted between the base unit and the PC. *Id.* The connection to the I/O port

allows data, such as control and status signals to be transmitted between the PC and the base unit. *Id.*

The PC contains software that allows the device to emulate POTS calls over the Internet, which requires, *inter alia*, determination of whether information received from the telephone handset is a DTMF tone or a voice signal from a user. The specifications of the patents-in-suit explain that "emulation of the POTS user experience" requires the system "to sense[] off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls. Ex. B, '481 patent, col. 2, line 4-8.

In operation, a user presses number keys on the keypad to dial a telephone number. Pressing number keys on the keypad causes circuitry within the handset to generate DTMF tones. *Id.* at col. 6, line 29-37; Ex. D, Declaration of Dr. Maggs, ¶ 22. The DTMF tones are sent to the handset transceiver, which then sends the DTMF tones to the remote cordless base unit as audio information. *Id.* The transceiver sends the DTMF audio information to the base unit via RF signals. *Id.* Alternatively, the DTMF tones may be packaged as data at the handset and rendered into DTMF tones at the base unit. *Id.* at col. 6, line 37-41; Ex. D, Declaration of Dr. Maggs, ¶ 22.

The base unit transmits the DTMF audio information to the PC via the sound card. Ex. B, '481 patent, col. 1, line 53-56; Ex. D, Declaration of Dr. Maggs, ¶ 23. The software contained on the PC processes the audio information to emulate a POTS call over the Internet, which requires determining whether the audio information received is a DTMF tone or a voice signal. Ex. B, '481 patent, col. 2, line 4-8; Ex. D, Declaration of Dr. Maggs, ¶ 21. The PC then sends the processed information to a gateway that is connected to both the Internet and the Public

Switched Telephone Network ("PSTN"), which routes the telephone call to a specific phone in the system. Ex. D, Declaration of Dr. Maggs, ¶ 23.

### C. Prosecution History of the '481 Patent

The '481 patent application was filed in the Patent and Trademark Office ("PTO") on December 11, 2000. In a May 7, 2004 office action, the patent examiner in charge of examining the patent application for the '481 patent rejected the application on the grounds that certain prior art references made it obvious to have a remote cordless telephony network device with a cordless handset, and a remote base unit connected to a PC for communication over a digital telephony network. Ex. 3 to the Declaration of Dr. Maggs at, p. USR000091.

Faced with this prior art, the applicant made several amendments to its claims, canceling some and amending others, to narrow the scope of what applicant sought as its invention. Most notable, because the patent examiner indicated that the prior art of record disclosed purportedly did not disclose a device with a PC having software to allow emulation of a cordless POTS telephone call over the Internet, the applicant amended claim 1 to include: "wherein said software is compatible with telephony software utilized by Internet telephony providers so as to allow emulation of a cordless POTS telephone call over the Internet." *Id.* at USR000099– USR000100. Following the applicant's amendments, the examiner issued a Notice of Allowance, closing the prosecution and allowing the application to issue into the '481 patent. *Id.* at USR000114–117.

### D. Prosecution History of the '371 Patent

The '371 patent application was filed in the PTO on December 13, 2005 as a continuation of the '481 application. All claims of the '371 patent application were rejected by the patent examiner in a March 16, 2006 office action. Ex. 5 to the Declaration of Dr. Maggs, p. USR000241. The claims 1-7 and 14-16 were rejected as anticipated by U.S. Patent No.

6,826,174 ("Erekson").  *Id.* at USR000244.  Original claim 8 was rejected as obvious over

Erekson, and original claim 1 was further rejected as obvious over U.S. Patent No. 6,728,546

("Peterson") in view of Erekson.  *Id.* at USR000247-248.

Faced with this prior art, in a May 16, 2006 amendment, the applicant made many

clarifying, qualifying and narrowing statements and amendments in an attempt to distinguish its

alleged invention over the prior art.  In particular, the applicant added the word "direct" to the

limitation explaining the connection between the PC and the Internet.  The applicant wrote:

> 2. Please amend Claim 1 by adding the word "direct", changing "and a computer having a
> connection to a digital telephony network" to "and a computer having a *direct* connection to a digital
> telephony network".

*Id.* at USR000256.  In addition, the applicants made clear that the amendment was being made

to distinguish the alleged invention from Erekson.  The applicants wrote:

> Voice modem...can cause massive user confusion" (Specification, Page 2 lines 5-6).  In Applicants'
> view, Claim 1 (from which the other claims depend) is distinguishable from Erekson, in that it
> provides for "a computer having a connection to a digital telephony network..." (Page 13, line 18)
> while the Erekson disclosure provides a computer connected to a specialized modem (which is not a
> part of a digital telephony network).  Accordingly, Applicants believe the claims are allowable over
> Erekson.  In order to highlight this distinction, and in the interest of promptly concluding prosecution
> of the pending application Applicants are amending Claim 1, changing the referenced language to "a
> computer having a *direct* connection to a digital telephony network..." so as to avoid an interpretation
> that would encompass connection to a digital telephony network through a specialized modem as
> described in Erekson.

*Id.* at USR000257 (emphasis added).  As a result of applicants' limiting amendment, the PTO

allowed the application and stated: "Erekson does not teach or suggest a computer having a

direct connection to a digital telephone network . . . ."  *Id.* at USR000270.

15

## V.   CLAIM CONSTRUCTION OF THE NECESSARY LIMITATIONS OF PATENTS-IN-SUIT[1]

Each of the patents-in-suit contains a single independent claim.  Each independent claim stands alone from the others and contains a complete listing of its elements or limitations.  *See C & F Packing Co. v. IBP, Inc.*, 916 F. Supp. 735, 742 (N.D. Ill. 1995; *Lampi, LLC v. Am. Power Prods., Inc.*, 65 F. Supp. 2d 757, 761 (N.D. Ill. 1999), *aff'd in part, vacated in part on other grounds*, 228 F.3d 1365 (Fed. Cir. 2000).   The remaining claims of the patents-in-suit are dependent claims, each of which includes the limitations of the claim(s) from which it depends along with their specific qualifiers.  *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989); *Lampi*, 65 F. Supp. 2d at 761-62.

On April 4, 2008, Defendants identified the claim-limitations that they believe are in need of construction by the Court.  Exhibits E and F.  On April 18, 2008, Defendants identified their proposed constructions for each of the identified claim limitations.  Ex. G.  Each of these claim limitations is discussed in further detail below.

### A.   "remote cordless telephone handset" and "remote cordless base unit"

Claim 1 in each of the patents-in-suit requires a "remote cordless telephone handset" and a "remote cordless base unit."  Defendants' construction of these limitations is set forth below.

| Claim Language | Defendants' Claim Construction |
|---|---|
| a remote cordless telephone comprising *a remote cordless telephone handset* and *a remote cordless base unit*; | The phrase "*remote cordless telephone handset*" means a cordless telephone handset that communicates with a cordless base unit via radio frequency signals.<br><br>The phrase "*remote cordless base unit*" means |

---

[1] Claim 1 of the '481 patent and claim 1 of the '371 patent have several similar claim limitations. Because the '481 patent and the '371 patent have essentially the same specifications and drawings, many terms in '481 patent are construed in the same way that similar terms are construed for '371 patent.

| | a cordless base unit that communicates with the cordless telephone handset via radio frequency signals. |
|---|---|

Defendants' construction is consistent with the plain and ordinary meaning of claim 1 and with the intrinsic evidence. The starting point of patent claim construction is to give the disputed terms their ordinary and customary meaning. *Phillips*, 415 F.3d at 1313. Claim 1 in each of the patents-in-suit lists several elements that the telephone handset and base unit must include, which indicate that the telephone handset and base unit are in wireless rf communication. For example, claim 1 states that the telephone handset must include "a microphone, a speaker, a dialpad, a *handset rf transceiver for communication with a base unit transceiver*, circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver, [and] circuitry for translating input from said handset rf transceiver means to an electrical signal as an input to said speaker." Ex. B, '481 patent, col. 7, line 32-39; Ex. C, '371 patent, col. 7, line 36-45 (emphasis added). Similarly, the base unit must include "a base unit *rf transceiver for communication with said handset rf transceiver* . . . ." Ex. B, '481 patent, col. 7, line 44-45; Ex. C, '371 patent, col. 7, line 47-48 (emphasis added).

The specifications and figures of the patents-in-suit also make clear that the "remote cordless telephone handset" is a wireless device a user may hold in his or her hand and use to speak and hear voice communication, and which communicates wirelessly via radio frequency signals with a separate "remote cordless telephone base unit." For example, the specifications state: "the Base 105 and Handset 107 communicate using standard 900 mhz radios . . . ." Ex. B, '481 patent, col. 3, line 5-6; Ex. C, '371 patent, col 3, line 7-9. The figures of the patents-in-suit show that the cordless telephone handset and the cordless base unit communicate wirelessly via radio frequency signals. For example, annotated version of Figure 3 is reproduced below.

**B.** **"circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver"**

Claim 1 in each of the patents-in-suit requires that the telephone handset contain "circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver." Defendants' construction of this limitation is set forth below.

| Claim Language | Defendants' Claim Construction |
|---|---|
| said remote cordless telephone handset comprising . . . *circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver,* | The phrase "*circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver*" means circuitry that converts the audio signal input to the microphone into radio frequency signals, which are then input into the radio frequency transceiver means. |

Defendants' construction is consistent with the limitation's plain and ordinary meaning. Claim 1 indicates that the audio information is "input into the microphone." Ex. B, '481 patent, col. 7, line 35-37; Ex. C, '371 patent, col. 7, line 39-41. The plain and ordinary meaning of

claim 1 makes it clear that the audio information is then translated "to an rf signal" by circuitry in the handset. *Id.* Equally clear is that after the circuitry translates the audio information, the audio information – in the form of rf signals - is input into the handset rf transceiver. *Id.* Thus, the plain and ordinary meaning of this limitation means that circuitry in the telephone handset converts the audio information from the microphone into radio frequency signals *before* being input into the radio frequency transceiver. Ex. D, Declaration of Dr. Maggs, ¶ 45.

C.     **"circuitry for translating a keypress on said dialpad into a DTMF tone as in input to said handset rf transmitter"**

Claim 1 of the '481 patent requires the "remote cordless telephone handset" to include "circuitry for translating a keypress on said dialpad into a DTMF tone as an input to said handset rf transmitter." Defendants' construction of this limitation is set forth below.

| Claim Language | Defendants' Claim Construction |
|---|---|
| said remote cordless telephone handset comprising . . . *circuitry for translating a keypress on said dialpad into a DTMF tone as an input to said handset rf transmitter*; | The phrase "*DTMF tone*" means a combination of high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for indicating which key on a keypad has been pressed.<br><br>The phrase "*circuitry for translating a keypress on said dialpad into a DTMF tone as an input to said handset rf transmitter*" therefore means that the telephone handset has circuitry that converts a keypress on the dialpad into a combination of high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) as an input to the handset rf transmitter means. |

Defendants' construction of this limitation is consistent with its ordinary meaning and with the intrinsic evidence. Because there is no express intent in the specification to impart a

novel meaning to the term "DTMF tone," the term therefore takes on its ordinary meaning. *Phillips*, 415 F.3d at 1303.   The term "DTMF" is well known to those of ordinary skill in the art as an abbreviation for "dual tone multi frequency."  Ex. D, Declaration of Dr. Maggs, ¶ 12; Ex. I, Newton's Telecom Dictionary, p. 400-02 (10th Ed. 1996); Ex. J, Microsoft Computer Dictionary, p. 166 (4th Ed. 1999); Ex. K, Glossary of Telecommunications Terms, p. D-32 (1996); Ex. L, The Authoritative Dictionary of IEEE Standards Terms, p. 340-341 (7th Ed. 2000); Ex. M, Modern Dictionary of Electronics, p. 294-295 (6th Ed. 1997).  "Dual tone multi frequency" is a combination of high and low tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for conveying information about which number on a keypad has been pressed.  *Id.*;  Ex.  N, http://www.dialabc.com/sound/dtmf.html ("DTMF 'Touch' Tones are defined in CCITT Volume VI: *General Recommendations on Telephone Switching and Signaling Recommendation Q.23: Technical Features of Push-Button Telephone Sets.*").[2]

The intrinsic evidence confirms that the term "DTMF" is used in claim 1 consistent with this ordinary meaning in the art.  For example, the specification of the '481 patent states:

- "A specialized *cordless telephone is provided with the means to* . . . *transport* audio, control and *DTMF tones* to a standard PC soundcard and I/O port."  (Ex. B, '481 patent, col. 1, line 53-56) (emphasis added);

- "The combined hardware and software portions allow Internet Telephony applications to sense, off hook, issue a dial tone, *receive DTMF tones*, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls."  (*Id.* at col. 2, line 3-7) (emphasis added);

- "the remote handset . . . may be used to trigger events and programs via *DTMF tones* . . . ."  (*Id.* at col. 2, line 9-11) (emphasis added);

---

[2] Federal Circuit case law makes clear that industry standards are often probative of industry-wide accepted meanings for disputed claim terms.  *LG Electronics,* 453 F.3d at 1375; *Aquatex Industries,* 419 F.3d at 1381-82.

- "The User then proceeds with the call by *dialing a number on DTMF Keypad 307* which is scanned by HS Control Chip 425 *and transmitted as audio* through HS RF Module 401 and RF Communications 106 to Base 105." (*Id*. at col. 4, line 29-32) (emphasis added);

- Reliability scoring ranged from 0 (no detection) to 10 (perfect), and was used to determine that the Primary/Harmonic ratio (which would *separate DTMF from similar sounds such as music*) could not be used on all PC sound systems. (*Id*. at col. 6, line 5-9 (emphasis added);

- "*DTMF detected* . . . assemble number until # (send) key then release audio input" (*Id*. at Fig. 2, block 207) (emphasis added);

- "[s]ample listing for setup of *DTMF recognition* and serial port operations *related to use of the Cordless Internet Telephone to emulate a POTS call* . . ." (*Id*. at Fig. 6, first line of program) (emphasis added); and

- "FIG. 8 is a listing of the C code for the *DTMF detection library function* after optimization. This *library function can be called by any user program to detect digits,* and runs continuously until stopped." (*Id*. at col. 6, lines 12-15) (emphasis added).

Also, Figure 4 of the '481 patent shows that "DTMF" is an output from "307 DTMF keypad."

An annotated excerpt from Figure 4 is shown below.



.

Riparius, however, contends that the term "DTMF" should be construed to mean "[p]ushbutton dialing rather than rotary dialing." Ex. H, Riparius' Proposed Claim Constructions. Riparius' proposed construction is legally incorrect and contrary to the ordinary meaning of the term. The term DTMF is well known in the telecommunications

industry to mean a combination of high and low tones used for conveying information about which number on a keypad has been pressed.  Ex. D, Declaration of Dr. Maggs, ¶ 12. Riparius's proposed construction ignores this dual-tone nature of DTMF – indeed, it reads the "dual tone" and the "multi frequency" components out of "Dual Tone Multi Frequency – and asks the Court to broaden the term to include any phone that uses buttons instead of rotors.  If Riparius wanted its claims to cover such a broad scope, it could have claimed and described the use of push-buttons broadly and tried its luck with the Patent Office on such claims. Instead, it sought more specific claims limited explicitly to DTMF and should not now be allowed to broaden those claims in claim construction.

Moreover, those of ordinary skill in the art recognize that pushbutton dialing in a POTS network – which is the type of dialing employed by the device claimed in the '481 patent - *requires* the generation and transmission of such DTMF tones.[3]  *Id.* at ¶ 46.  Thus, Riparius' proposed construction of the term DTMF ignores the plain and ordinary meaning of the term and renders the term in claim 1 superfluous.  Following such an approach would be legally incorrect.

### D.    "said remote cordless telephone base unit connected to a computer"

Claim 1 of each of the patents-in-suit requires "a computer having a connection to a digital telephony network and a connection to said remote cordless telephone bas[e] unit." Defendants' construction of this term is set forth below.

| Claim Language | Defendants' Claim Construction |
|---|---|
| *said remote cordless telephone base unit connected to a computer*, | The phrase "*remote cordless telephone base unit connected to a computer*" means that the |

---

[3] Claim 1 of the '371 patent and claim 1 of the '471 patent require the claimed telephony device to "emulat[e] a POTS telephone call over the Internet."  As explained in more detail at Section V. G. below, the emulation of a POTS telephone call requires the generation and transmission of DTMF tones.

| | remote cordless telephone base unit is in electronic communication with a personal computer ("PC") via an I/O port and a sound card. |
|---|---|

Defendants' construction is consistent with the intrinsic evidence. The only type of computer described by the specifications of the patents-in-suit is a personal computer ("PC"). *See* Ex. D, Declaration of Dr. Maggs, ¶ 51. Figure 3 of the patents-in-suit clearly show the computer being a PC. An annotated version of Figure 3 is shown below:



In addition, the specifications of the patents-in-suit make clear that a "computer" is a PC. For example, in describing Figure 3, the specifications state: "Fig. 3 [d]epicts a preferred embodiment *where PC 100 connects to the specialized handset base 105* . . . ." Ex. B, '481 patent, col. 3, line 59-60; Ex. C, '371 patent, col. 3, line 61-62 (emphasis added). The specifications further explain that "[a] remote Internet telephony appliance . . . *consists of a PC*

*100*, [c]ordless handset base unit 105 and cordless handset 107." Ex. B, '481 patent, col. 3, line 1-4; Ex. C, '371 patent, col. 3, line 4-7 (emphasis added).

Furthermore, the specifications of the patents-in-suit make are clear that the connection between the PC and the base unit is a wired connection via a sound card and I/O (*i.e.*, input/output) port. In fact, the only type of connection between the computer and the base unit described by the specifications of the patents-in-suit is via both a sound card and I/O port. Ex. D, Declaration of Dr. Maggs, ¶ 52 – 54. The specifications state: "A specialized cordless telephone is provided with the means to signal device ready status, trigger a standard telephone ring, and transport audio, control and DTMF tones *to a standard PC soundcard and I/O port*." Ex. B, '481 patent, col. 1, line 53-56; Ex. C, '371 patent, col. 1, line 56-59 (emphasis added). In describing the "experimentation" of the system and Figure 7, the specifications refer again to PCs with sound cards by which the base unit is connected. Ex. B., '481 patent, col. 5, line 53- col. 6, line 11; Ex. C, '371 patent, col. 5, line 56 – col. 6, line 15. This connection via the sound card is necessary to allow the computer to monitor for DTMF tones. Ex. B, '481 patent, col. 3, line 36-39; Ex. C, '371 patent, col. 3, line 38-40. Figure 4 of the patents-in-suit is illustrative, and an annotated version of Figure 4 is shown below:



E.        "means for determining whether said communication represents a DTMF signal or audio information"

Claim 1 of the '481 patent requires that the "remote cordless telephone base unit" contain "means for determining whether said communication represents a DTMF signal or audio information."  The phrase "means for determining whether said communication represents a DTMF signal or audio information" is a means-plus function limitation.  The limitation, however, is indefinite under 35 U.S.C. § 112 for several reasons.[4]

At the outset, the limitation is indefinite because the specification of the '481 patent fails to disclose a structure that is clearly linked to the function recited in the claim.  It is a fundamental principle of patent law that a limitation written in means-plus-function format is limited to specific structures disclosed in the specification that perform the claimed function.  *B. Braun Med. Inc.*, 124 F.3d at 1424.  In addition, the "structure disclosed in the specification is 'corresponding' structure _only_ if the specification or prosecution history _clearly links or associates_ that structure to the function recited in the claim."  *Id.* (emphasis added).  The Federal Circuit explained:

> If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid [the price for use of the convenience of broad claiming afforded by § 112, ¶ 6] but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification.  Such is impermissible under the statute.

*Med. Instrumentation,* 344 F.3d at 1211.  If one of ordinary skill in the art would not understand the specification to disclose a structure corresponding to the recited function in a means-plus-

---

[4] A determination as to whether a patent claim meets the definiteness requirement is a question of law to be decided by the court in performance of its duty as the construer of patent claims. *Bancorp Services, L.L.C. v. Hartford Life Insurance Co.,* 359 F.3d 1367, 1371 (Fed.Cir.2004).  A determination of definiteness is made based upon proper interpretation of the meaning of the terms used in the claim, according to the canons of claim construction. *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1340-41 (Fed.Cir.2003).

function limitation, then the limitation is indefinite. *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007).

Here, the function recited in the limitation is "determining whether the communication from the handset rf transceiver represents a DTMF signal or audio information."[5]  Neither the specification nor the prosecution history of the '481 patent, however, clearly link or associate any structure contained in the base unit to the function of "determining" whether the communication is a DTMF signal or audio information.  *See* Ex. D, Declaration of Dr. Maggs, ¶ 55 – 58.  In fact, other than being recited in claim 1, the term "determining" is nowhere to be found in the '481 specification or prosecution history.  *See id.*  Claim 1 is therefore invalid.

Riparius contends that "a Base RF Module 451 and a Base Control Chip 470" are the structures associated with the function of "determining whether said communication represents a DTMF signal or audio information."  Ex.H, Riparius' Proposed Claim Constructions.  Riparius' contention, however, fails for several reasons.  First, Federal Circuit case law makes clear that a structure in the specification not linked to the recited function cannot be considered corresponding structure even if that structure is capable of performing the recited function.  *See Med. Instrumentation*, 344 F.3d at 1216; *Medtronic,* 248 F.3d at 1311.  Here, neither the specification nor the prosecution history of the '481 patent clearly links or associates the "Base RF Module 451" and the "Base Control Chip 470" with "determining" whether the communication is a DTMF signal or audio information.  *See* Ex. D, Declaration of Dr. Maggs, ¶ 59.

Second, Federal Circuit case law is clear that with respect to computer implemented means-plus-function claims – like claim 1 of the '481 patent - the patent specification must (1)

_____

[5] The phrase "DTMF signal" means a signal complying with the DTMF standard (CCITT Recommendation Q.23). Ex. D, Declaration of Dr. Maggs, ¶ 46.

disclose "more than simply a general purpose computer or microprocessor"; and (2) "at least disclose the algorithm that transforms the general purpose microprocessor to a special purpose computer programmed to perform the disclosed algorithm." *Aristocrat Technologies*, 86 U.S.P.Q.2d at 1239. Here, the "Base RF Module 451" and the "Base Control Chip 470" are only general references to microchips with very basic circuitry. Ex. D, Declaration of Dr. Maggs, ¶ 57. The specification of the '481 patent does not disclose any algorithm that could be utilized by the "Base RF Module 451" and "Base Control Chip 470" to determine whether communication represents a DTMF signal or audio information. *Id*. Simply put, there is nothing in the specification explaining how one would make or use the "Base RF Module 451" and "Base Control Chip 470" to determine whether said communication represents a DTMF signal or audio information. *Id*.

Finally, in situations where a specification describes structure corresponding to a claimed function and describes other structure that is associated with other functions, it is improper to include the other structure as additional structure corresponding to the claimed function of the means-plus-function limitation. *See Medical*, 344 F.3d at 1216. Here, the "Base RF Module 451" and "Base Control Chip 470" already have several other functions to which they are clearly linked – none of which are to the claimed function of "determining" whether said communication represents a DTMF signal or audio information. For example:

- The "Base RF Module 451" decodes compressed audio signals before transmission to the PC. Specifically, "[t]he Base Compander 460 compresses the audio stream and forwards it to the Base RF Module 451 via Audio In 452 . . . and [t]he Base RF Module 451 decodes the Audio Out 453 which is expanded in Base Compander 460 and sent to the PC 100 via Audio Out 466." Ex. B, '481 patent, col. 4, line 19-21 and 32-35.

- The "Base RF Module 451" may also communicate the loss of the carrier signal "via carrier line to Base Control Chip 470." *Id*. at col. 4, line 58-61.

- The "Base Control Chip 470" transmits commands to the "Base RF Module 451. For example, "Base Control Chip 470 sends a ring command via Data 475 line to the Base RF Module 451." *Id.* at col. 5, line 12-14. The Base Control Chip 470, however, does not demodulate or interpret the ring command, but rather "[t]he ring command is demodulated by Handset RF Module 401 and interpreted by HS Control Chip 425." *Id.* at col. 5, line 12-16.

- The "Base Control Chip 470" may also indicate to the PC that the phone is off-hook. *Id.* at Col. 4, line 1-12.

Assuming *arguendo* that there is structure disclosed in the '481 patent corresponding to the claimed function, which there is not, the only possible structure in the base unit that could be associated with the claimed function is the "110 DTMF Decode" box disclosed in Figure 1 of the '481 patent. As shown in the annotated figure below, Figure 1 of the '481 patent includes a box on the "cordless handset base unit" generally labeled "110 DTMF decode."



Despite Figure 1 of the '481 patent disclosing a box labeled "110 DTMF Decode," claim 1 is invalid because the specification of the '481 patent fails to provide a description of how a person having ordinary skill in the art would make or use the "110 DTMF Decode" box. Patent law precedent makes clear that a means-plus-function claim is invalid if the specification fails to provide a description of how a person having ordinary skill in the art would make or use the structure corresponding to the recited function in a means-plus-function limitation. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1283 (Fed. Cir. 2007). The box labeled "110

DTMF Decode" Figure 1 is the only description of the alleged structure.  *See* Ex. D, Declaration of Dr. Maggs, ¶ 57.  The specification of the '481 patent does not provide *any* explanation for the "DTMF decode" box.  Indeed, the specification fails to describe what the "DTMF Decode" is, how it works, or how it is constructed.  *See id.*  For example, the specification fails to disclose a circuit, a computer operating a software algorithm, or other apparatus which performs the functions designated for the "110 DTMF Decode."  *See id.*  Simply put, a box that is generally labeled "110 DTMF Decode" fails to describe how a person having ordinary skill in the art would make or use the "DTMF decode."  *See id.*

Alternatively, if the Court determines that claim 1 is not invalid, then the corresponding structure for claimed function (*i.e.*, "determining whether said communication represents a DTMF signal or audio information") should be construed to include the description at: col. 3, line 39-41; col. 4, line 37-52; col. 5, line 43 – col. 6, line 15; Fig. 1; Fig. 2; Fig. 4; Fig. 6; Fig. 7; and Fig. 8 (generally describing chips, analysis, algorithms, and software).

F.    **"means for transmitting signals between said base unit rf transceiver and said computer"**

Claim 1 in each of the patents-in-suit requires that the remote cordless base unit include "means for transmitting signals between said base unit rf transceiver and said computer."  The Defendants' construction of this limitation is set forth below.

| Claim Language | Defendants' Claim Construction |
|---|---|
| said remote cordless telephone base unit . . . comprising . . . *means for transmitting signals between said base unit rf transceiver and said computer*; | The phrase "*means for transmitting signals between said base unit rf transceiver and said computer*" is a means-plus-function limitation.  The function recited in the limitation is transmitting signals between the base unit rf transceiver and the communication I/O port and sound card of the PC.<br><br>Corresponding structures for transmitting signals between the base unit rf transmitter and |

|  | the and the two necessary connections, one to the I/O and one to the sound card, of the PC is disclosed at col. 3, line 59-64; col. 4, line 1-3; col. 4, line 32-37; col. 5, line 55 – col. 6, line 9; col. 6, line 16 – col. 7, line 9; and Figs. 1-4 (generally describing USB ports, I/O ports, RS232 ports, and PC sound cards with audio in and audio out ports) |
|---|---|

This is a means-plus-function limitation.  The claimed function is "transmitting signals between said base unit rf transceiver and said computer."  The specifications of the patents-in-suit make it clear that there is a two-fold connection between the base unit and the PC, including both a wired connection via a sound card and a separate connection via an I/O port.  In fact, the only type of connection between the computer and the base unit described by the specifications of the patents-in-suit is via both a sound card *and* I/O port.  *See* Ex. Declaration of Dr. Maggs, ¶ 61.  The Summary of the Invention section of the specifications state: "A specialized cordless telephone is provided with the means to signal device ready status, trigger a standard telephone ring, and transport audio, control and DTMF tones *to a standard PC soundcard and I/O port*."  Ex. B, '481 patent, col. 1, line 53-56; Ex. C, '371 patent, col. 1, line 56-59 (emphasis added).  In addition, Figure 4 of the patents-in-suit is illustrative, and an annotated version of Figure 4 is shown below:



The specifications disclose several structures for transmitting signals between the base unit and the PC soundcard and I/O port. Corresponding structures for transmitting signals between the base unit and the communication I/O port of the PC include any of the following and their equivalents: (1) USB port; (2) I/O port; and (3) standard RS232 port. Ex. B, '481 patent, col. 1, lines 56-60; col. 4, line 1-3; Fig. 4; Ex. C, '371 patent, col. 1, line 59-63; col. 4, line 3-5; Fig. 4. Corresponding structures for transmitting signals between the base unit and sound card of the PC include any of the following and their equivalents: (1) standard PC sound card; (2) audio out port; and (3) audio in port. Ex. B, '481 patent, col. 1, lines 56-60; col. 3, line 59-64; Fig. 4; Ex. C, '371 patent, col. 1, line 56-59; col. 3, line 59-66; Fig. 4. As noted above, the connection via a sound card is described as corresponding structure that is needed to enable the computer to monitor for DTMF tones. Ex. B, '481 patent, col. 3, line 36-39; Ex. C, '371 patent, col. 3, line 38-40.

Riparius contends that the claimed function – *i.e.*, "transmitting signals between said base unit rf transceiver and said computer" – can be performed solely *via* the USB port. Ex. H, Riparius' Proposed Claim Constructions. Riparius' proposed construction is erroneous for several reasons. First, neither the specifications nor the prosecution histories of the patents-in-suit clearly link or associate the USB port as the sole means for transmitting signals between the base unit and the PC. Ex. D, Declaration of Dr. Maggs, ¶ 63–64.

Second, Riparius' proposed construction is at odds with the description of the invention in the specifications of the patents-in-suit which teach away from using only the USB to transmit signals from the base unit to the PC. For example, the Field and Background of the Invention describes the problems with the prior art as follows: "USB based solutions which also add an additional sound system suffer from some of the same issues, and are additionally limited by the

USB specification to approximately 12 ft. range from the computer." Ex. B, '481 patent, col. 1, line 46-47; Ex. C, '371 patent, col. 1, line 49-52. In the very next sentence in the Summary of the Invention, the specifications make clear that the transmission of signals to the PC is accomplished *via* a PC soundcard and I/O port – not the USB port alone: "A specialized *cordless telephone is provided with the means to* signal device ready status, trigger a standard telephone ring, and *transport* audio, control and *DTMF tones to a standard PC soundcard and I/O port*." Ex. B, '481 patent, col. 1, line 53-56; Ex. C, '371 patent, col. 1, line 56-59 (emphasis added). As the Federal Circuit has held, Summary of the Invention statements "are not limited to describing a preferred embodiment, but more broadly describe the overall inventions." *Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1348 (Fed. Cir. 2004), *cert. denied*, 125 S.Ct. 61 (2004). One of ordinary skill in the art, reading the specifications of the patents-in-suit, would therefore not understand the specifications of the patents-in-suit as disclosing a USB port alone as the means for performing the recited function. Ex. D, Declaration of Dr. Maggs, ¶ 64.

    **G.**    **"said software is compatible with telephony software utilized by Internet telephony providers so as to allow emulation of a cordless POTS telephone call over the Internet"**

Claim 1 in each of the patents-in-suit requires that the software on the PC "allow emulation of a cordless POTS telephone call over the Internet . . . ." Defendants' construction of this limitation is set forth below.

| Claim Language | Defendants' Claim Construction |
|---|---|
| wherein *said software is compatible with telephony software utilized by Internet telephony providers so as to allow emulation of a cordless POTS telephone call over the Internet* | The phrase *"software is compatible with telephony software utilized by Internet telephony providers so as to allow emulation of a cordless POTS telephone call"* means the software causes the claimed device to emulate a POTS telephone by the ability to sense whether the phone is off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as |

| | ring and connect inbound calls. |
|---|---|

Defendants' construction is supported by the ordinary meaning and the intrinsic evidence. The important Summary of the Invention sections of the specifications of the patents-in-suit specifically define what it means to "emulate" a POTS telephone call. Specifically, the specifications make it clear that "emulation" of a POTS call means "to sense, off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls" Ex. B, '481 patent, col. 2, line 3-7; Ex. C, '371 patent, col. 2, line 6-10. The annotated excerpt from the specifications states this functionality allows for "emulation of the POTS line user experience." Ex. B, '481 patent, col. 2, line 7-8; Ex. C, '371 patent, col. 2, line 10-11.

| | |
|---|---|
| desired. The combined hardware and software portions, allow Internet Telephony applications to sense, off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls. This allows full emulation of the POTS line user experience. | "This allows for full _emulation_ of the POTS line user experience." '481 patent, col. 2, line 7-8 (emphasis added) |

Consistent with this, in the detailed description of the invention, the specifications state: "Fig. 2 is a flow chart of the interaction of software and hardware to _emulate_ POTS line operation." Ex. B, '481 patent, col. 2, line 39-40; Ex. C, '371 patent, col. 2, line 42-43. Significantly, Figure 2 makes clear that DTMF generation and detection is required for emulating a POTS call. An annotated excerpt from Figure 2 is shown below.



The specifications of the patents-in-suit further explain that "In Fig. 2 the progress of the *software to emulate a POTS call is depicted* . . . Upon detection of a change in Status Out 103, *the program triggers Windows to* . . . *engage Audio In 102 monitoring 206 for DTMF tones*." Ex. B, '481 patent, col. 3, line 21-39; Ex. C, '371 patent, col. 3, line 23-41. Similarly, the description at the top of Figure 6 of the patents-in-suit states: "Sample listing for setup of DTMF recognition . . . related to use of the Cordless Internet Telephone to emulate a POTS call using one of several service providers." Ex. B, '481 patent, Fig. 6; Ex. C, '371 patent, Fig. 6.

The description in the specification and the figures is consistent with what one of ordinary skill in the art would understand this limitation to mean. The plain and ordinary meaning of the term "emulate" means to "imitate" or "behave in the same manner." Ex. D, Declaration of Dr. Maggs, ¶ 68 (citing Newton's Telecom Dictionary, p. 249 (17th Ed. 2001); Microsoft Computer Dictionary, p. 166 (4th Ed. 1999); Modern Dictionary of Electronics, p. 294-295 (6th Ed. 1997). In addition, one of ordinary skill in the art understands that for a system to "emulate" a conventional POTS call, then that system must perform all of the functions of a POTS system, which includes the generation and transmission of DTMF audio tones to place a telephone call. Ex. D, Declaration of Dr. Maggs, ¶ 69. In other words, to emulate a POTS

system, the emulating system must generate and transmit a combination of high and low audio

tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23)

used for indicating which key on a key pad has been pressed.  *Id*.

    **H.**    **"circuitry for translating a keypress on said dialpad into data representing said keypress as an input to said handset rf transceiver"**

    Claim 1 of the '371 patent requires the "remote cordless telephone handset" to include

"circuitry for translating a keypress on said dialpad into data representing said keypress as an

input to said handset rf transmitter."  Defendants' construction of this limitation is set forth

below.

| Claim 1 | Defendants' Claim Construction |
|---|---|
| said remote cordless telephone handset comprising . . . *circuitry for translating a keypress on said dialpad into data representing a keypress as an input to said handset rf transceiver*; | The phrase "*circuitry for translating a keypress on said dialpad into data representing a keypress as an input to said handset rf transceiver*" means circuitry that converts a keypress on the dialpad into data representing a DTMF tone as an input to the handset rf transceiver means. |

    Defendants' construction is consistent with the intrinsic evidence.  In fact, the only type

of dialpad described by the specification of the '371 patent is a DTMF[6] keypad.  *See* Ex. C, '371

patent, Fig. 4; Ex. D, Declaration of Dr. Maggs at ¶ 70.  The specification makes equally clear

that data representing a keypress means data representing a DTMF tone.  For example, the

specification states:

    The User then proceeds with the call by *dialing a number on DTMF Keypad 307 which is scanned by HS Control Chip 425 and transmitted as audio* through HS

---

[6] As explained in Section V.C. above, the term "DTMF" is well known to those of ordinary skill in the art as an abbreviation for "dual tone multi frequency," which is a combination of high and low tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for conveying information about which number on a keypad has been pressed.  Ex. D, Declaration of Dr. Maggs, ¶ 12.

RF Module 401 and RF Communications 106 to Base 105. . . . In alternative preferred embodiments, the *handset DTMF 307 may be scanned and sent by HS Control Chip 425 and Data+Ctl 426 as data, not audio, to be decoded and rendered into DTMF tones* in Base 105 by Base Control Chip 470.

Ex. C, '371 patent, col. 4, line 31-43 (emphasis added).  Similarly, the specification states: "the remote handset . . . may be used to trigger events and programs *via DTMF tones* . . . ." *Id* at col. 2, line 12-14 (emphasis added).

I.     **"means for determining whether said communication represents data representing a keypress or audio information"**

Claim 1 of the '371 patent requires that the remote cordless base unit" include "means for determining whether said communication represents data representing a keypress or audio information."  This is a means-plus-function limitation.  The function recited in the limitation is "determining whether said communication from the handset represents data representing a keypress (*i.e.*, data representing a DTMF signal) or audio information (*i.e.*, information input into the handset microphone)."  The phrase "said communication" means the signal transmitted between the telephone handset and the base station.  Ex. C, '371 patent, col. 7, line 36-38.  The specification of the '371 patent indicates that the "data representing a keypress" is a DTMF signal.  *Id*. at col. 4, line 31-43.  Additionally, claim 1 makes clear that the phrase "audio information" means voice information "input into the handset microphone".  *Id*. at col. 7, line 38-40 (previously defining "audio information" as "input into the handset microphone").

Similar to the claim limitation discussed in Section V.E. above, however, this limitation is indefinite under 35 U.S.C. § 112, ¶ 2 for several reasons.  First, the limitation is indefinite because neither the specification nor the prosecution history of the '371 patent clearly link or associate any structure contained in the base unit to the function of "determining" whether the communication is a data representing a DTMF signal or information input into the handset microphone.  Ex. D, Declaration of Dr. Maggs, ¶ 74.  In fact, other than being recited in claim 1,

36

the term "determining" is nowhere to be found in the '371 specification or prosecution history. *Id*.

Second, for the same reasons discussed in Section V.E. above, Riparius' contention that "a Base RF Module 451 and a Base Control Chip 470" are the structures associated with the function of "determining whether said communication represents a DTMF signal or audio information" is erroneous.  Ex. H, Riparius' Proposed Claim Constructions.  Neither the specification nor the prosecution history of the '371 patent clearly links or associates the "Base RF Module 451" and the "Base Control Chip 470" with "determining whether said communication from the handset represents data representing a keypress or audio information." Ex. D, Declaration of Dr. Maggs, ¶ 74.  Additionally, there is nothing in the specification explaining how one would make or use the "Base RF Module 451" and "Base Control Chip 470" to determine whether the communication from the handset represents data representing a keypress or audio information.  *Id*.  Moreover, the "Base RF Module 451" and "Base Control Chip 470" already have several other functions to which they are clearly linked – none of which are the claim function of "determining whether said communication from the handset represents data representing a keypress or audio information."  *Id*.

Third, assuming *arguendo* that there is structure disclosed in the '371 patent corresponding to the claimed function, which there is not, the only possible structure in the base unit that could be associated with the claimed function is the "110 DTMF Decode" box disclosed in Figure 1 of the '371 patent.  As explained in Section V.E. above, despite this disclosure, the specification of the '371 patent fails to provide a description of how a person having ordinary skill in the art would make or use the "110 DTMF Decode" box.  Ex. D, Declaration of Dr. Maggs, ¶ 57.  As a result, claim 1 is therefore invalid.  *See Auto. Techs.*, 501 F.3d at 1283.

Alternatively, if the Court determines that claim 1 is not invalid, then the corresponding structure for claimed function (*i.e.*, "determining whether said communication from the handset represents data representing a keypress or audio information") should be construed to include the description at: col. 3, line 41-43; col. 4, line 39-54; col. 5, line 45 – col. 6, line 19; Fig. 1; Fig. 2; Fig. 4; Fig. 6; Fig. 6a-6k; Fig. 7; Fig. 7a; Fig. 8; and Fig. 8a-8f (generally describing chips, analysis, algorithms, and software).

**J.**    **"a computer having a direct connection to a digital telephony network"**

Claim 1 in the '371 patent requires "a computer having a direct connection to a digital network." Defendants' construction of this limitation is set forth below.

| Claim Language | Defendants' Claim Construction |
| --- | --- |
| a *computer having a direct connection to a digital telephony network* | The phrase "*computer having a direct connection to a digital telephony network*" means that the PC is connected to a digital telephony network without an intervening modem or communication mechanism. |

Defendants' construction is consistent with the intrinsic evidence. For example, the prosecution history of the '371 patent indicates that a "direct" connection requires a connection to the "digital telephony network" *without* an intervening modem or equivalent communication network. The word "direct" was added to claim 1 during prosecution to avoid a rejection based on U.S. Patent No. 6,826,174 to Erekson et al. ("Erekson"). Specifically, during prosecution, the Patent and Trademark Office rejected claim 1 as anticipated by Erekson. Ex. 5 to the Declaration of Dr. Maggs, p. USR000247–248. Erekson discloses several embodiments with several different types of modem connections. For example, Erekson describes other embodiments which "include systems with two modems, a modem and a sound card, a network interface card and a modem or sound card, or any other dual CODEC system wherein once [*sic*] CODEC is

dedicated to the telephone communication and the other facilitates network communication."

Ex. 16 to the Declaration of Dr. Maggs, col. 8, lines 56-62.  Erekson further states:

> In addition to the improved architecture [*sic*] of the dual CODEC modem, the present invention also benefits from the improved network connections available to the household user, *such as G-lite DSL, aDSL, or xDSL network connections*. While a user can use a standard telephone, plug it into the present invention, and make VoIP calls, through the standard PSTN or POTS connection, *the more preferred network connection is a sub-rate DSL connection*. A G-lite DSL connection is a sub-rate of a Digital Subscriber Link (DSL).

*Id*. at col. 4, line 34-43 (emphasis added).   In addition, as shown in the annotated Figure 1 of Erekson at right, Erekson discloses a computer 20 using a standard modem 54 to connect to WAN 52. *See also id*. at col. 7, ll. 60 – 65.



In response to the Patent Trademark Office's rejection, applicants' wrote:

> 2.  Please amend Claim 1 by adding the word "direct", changing "and a computer having a connection to a digital telephony network" to "and a computer having a <u>direct</u> connection to a digital telephony network".

Ex. 5 to the Declaration of Dr. Maggs, p. USR000256.  In addition, the applicants made clear that the amendment was being made to distinguish the alleged invention from Erekson.  The applicants wrote:

> Voice modem...can cause massive user confusion" (Specification, Page 2 lines 5-6).  In Applicants' view, Claim 1 (from which the other claims depend) is distinguishable from Erekson, in that it provides for "a computer having a connection to a digital telephony network..." (Page 13, line 18) while the Erekson disclosure provides a computer connected to a specialized modem (which is not a part of a digital telephony network).  Accordingly, Applicants believe the claims are allowable over Erekson.  In order to highlight this distinction, and  in the interest of promptly concluding prosecution of the pending application Applicants are amending Claim 1, changing the referenced language to "a computer having a direct connection to a digital telephony network..." so as to  avoid an interpretation that would encompass connection to a digital telephony network through a specialized modem as described in Erekson.

*Id*. at USR000257 (emphasis added).  As a result of applicants' limiting amendment, the Patent and Trademark allowed the application and stated: "Erekson does not teach or suggest a computer having a direct connection to a digital telephone network since Erekson relies upon a voice modem to connect to a telephone network."  *Id*. at USR000270.

In sum, applicants disclaimed a connection between the PC and the Internet via a modem based on the statements they made during prosecution of the '371 patent.  It is therefore clear that the phrase "direct connection" means "a connection intervening modem or equivalent communication mechanism."  *See* Ex. D, Declaration of Dr. Maggs at ¶ 78.  Any other construction would ignore the prosecution history of the '371 patent and would be at odds with the clear meaning of the word "direct," which is without anything intervening.  *See Microsoft v. Multitech Systems*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (Determining claim language requiring transmission over a telephone network to mean over a telephone network without anything intervening based, in part, on statements made during prosecution that invention was limited to a "direct" connection over a telephone line.).

K.    **"rf transceiver for communication with a base unit" and "said rf transceiver means"**

Claim 1 of the '481 patent requires that the telephone handset comprise an "rf transceiver means" for "communication with a base unit transceiver." This is a means-plus-function limitation. The use of the term "means" in a claim limitation raises the presumption that the term is a means-plus-function limitation. *Valmont Indus., Inc.* at 1041-42 (Fed. Cir. 1993).

The function recited in the limitation "communication with a base unit transceiver." This claim, however, is indefinite under 35 U.S.C. § 112 for failure to disclose the structure that corresponds to the claimed function. The only possible structure contained in the handset disclosed in the specification of '371 patent is a box on the "cordless handset" labeled "401 HS RF Module." Ex. B, '481 patent, Fig. 4. The specification, however, does not provide any explanation for the "401 HS RF Module" box sufficient to determine its structure. As a result, claim 1 is invalid. *See Med. Instrumentation*, 344 F.3d at 1216; *Medtronic*, 248 F.3d at 1311.

Alternatively, assuming *arguendo* that claim 1 is not indefinite under § 112, the corresponding structure for this function should be construed to include the description at col. 3, line 4-7; col. 4; line 8-15; col. 4, line 19-32; col. 4, line 55-58; col. 5, line 14-20; and Fig. 4 (generally describing circuitry, companders, and control chips that can communicate, via radio frequency, between a handset and a base unit).

L.    **"providing ready status"**

Claim 6 in each of the patents-in-suit require that "said software is programmed to . . . *providing ready status* . . . ." The phrase *"providing ready status"* means the "software provides a signal that identifies the ready status of the telephone." Defendants' construction is consistent with the intrinsic evidence. For example, the specifications states:

> The specialized telephone is accompanied by *software that provides* for detecting the presence of the telephone on any port, providing ready status where "ready" is

41

defined as either (1) on hook in base or (2) out of base, not in use with radios and security codes synchronized. The software provides an interface to standard Internet Telephony systems in the simplest possible terms which may be characterized as "Unit Ready" and "Ring Unit".

Ex. B, '481 patent, col. 1, line 60 - col. 2, line 1; Ex. C, '371 patent, col. 1, line 63 - col. 2, line 4

(emphasis added).

## VI.    <u>CONCLUSION</u>

For the foregoing reasons and authorities, Defendants' respectfully requests that the disputed limitations of the patents-in-suit be construed as detailed above.

Respectfully submitted,

Dated: May 8, 2008

/s/ Jason S. Shull
Timothy C. Meece
   tmeece@bannerwitcoff.com
Jason S. Shull
   jshull@bannerwitcoff.com
Shawn P. Gorman
   sgorman@bannerwitcoff.com
BANNER & WITCOFF, LTD.
10 S. Wacker Drive, Suite 3000
Chicago, Illinois  60606
Telephone:    (312) 463-5000
Facsimile:    (312) 463-5001
*Attorneys for Defendant/Counterclaim-Plaintiff, Logitech International SA. and U.S. Robotics*

Dated: May 8, 2008

/s/ Douglas E. Lumish
Douglas E. Lumish
Jared Bobrow
Joseph H. Lee
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Telephone:    (650) 802-3000
Facsimile:    (650) 802-3100
*Attorneys for Defendant/Counterclaim-Plaintiff, Cisco Systems, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the foregoing document was served this 8th day of May, 2008, pursuant to the Federal Rules of Civil Procedure on the following counsel/parties:

---

### <u>*Via* the Court's ECF Filing</u>

Joseph N. Hosteny
Arthur A. Gasey
NIRO, SCAVONE, HALLER & NIRO
181 West Madison, Suite 4600
Chicago, IL  60602
Telephone: (312) 236-0733
Facsimile: (312) 236-3137

*Attorneys for Plaintiff/Counterclaim-
Defendant,
Riparius Ventures LLC*

---

### <u>*Via* First Class Mail</u>

Troy Bullock
Chief Financial Officer, Corporate Secretary
ASCALADE COMMUNICATIONS INC.
12051 Riverside Way
Richmond, BC
Canada V6W 1K7

*Defendant/Counterclaim-Plaintiff,
Ascalade Communications, Inc.*

---

Dated: May 8, 2008                    /s/ Jason S. Shull
                                      _____

                                      *One of the attorneys for
                                      Defendant/Counterclaim-Plaintiff, Logitech
                                      International SA. and U.S. Robotics*