**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RIPARIUS VENTURES, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | Civil Action Nos. 07-CV-3063 and 07- |
| | ) | CV-6121 |
| v. | ) | |
| | ) | |
| ASCALADE COMMUNICATIONS, INC., | ) | Judge John W. Darrah |
| LOGITECH INTERNATIONAL S.A., | ) | Presiding Magistrate Judge Schenkier |
| KONINKLIJKE PHILIPS ELECTRONICS | ) | |
| N.V., U.S. ROBOTICS and CISCO | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |
| | ) | |

I, Bruce MacDowell Maggs, declare and state as follows:

## BACKGROUND AND QUALIFICATIONS

1.      I am a tenured Professor of Computer Science in the School of Computer Science at Carnegie Mellon University. I joined the faculty as an Assistant Professor in January 1994, was promoted to Associate Professor in July 1997, was given tenure in July 1999, and was promoted to (full) Professor in 2004. From September 1998 through January 1999, I was also a Visiting Associate Professor in the Electrical Engineering and Computer Science Department at the Massachusetts Institute of Technology. Since September 2007 to the present, I have been serving as Visiting Professor in the Computer Science Department at Duke University.

2.      Before joining the faculty at Carnegie Mellon, I was a Research Scientist at NEC Research Institute, Inc. from September 1990 through January 1994.

3.      In 1998, I helped launch Akamai Technologies, which is an Internet content delivery service. I served as a Senior Research Scientist for Akamai from January 1999 through March 1999, and as Vice President for Research and Development from April 1999 through

EXHIBIT
D

December 1999. I am currently the Vice President for Research at Akamai and have held this position since January 2000.

4.      I received my Doctorate degree in Computer Science from the Massachusetts Institute of Technology in 1989, my Masters of Science degree in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology in 1986, and my Bachelor's of Science degree in Computer Science from the Massachusetts Institute of Technology in 1985.

5.      Additional information concerning my background and qualifications is set forth in my Curriculum Vitae, which is attached as Exhibit 1 to this Declaration.

6.      Within the last five years, I have testified as either an expert at trial or by deposition in the following cases: *Lexmark International, Inc. v. Static Control Components, Inc.*, No. 02-571-KSF, United States District Court, Eastern District of Kentucky, and *Windy City Innovations, LLC v. America Online, Inc.*, No. 04 C 4240, United States District Court, Northern District of Illinois, Eastern Division.

7.      I have been retained by counsel for defendants Logitech International S.A. ("LISA") and U.S. Robotics Corp. ("USR") in this litigation to serve as an expert consultant and possibly as a testifying expert witness to provide my objective opinions regarding various technical matters involved in this case. I am being compensated at the rate of $350 per hour plus expenses. No part of my compensation depends on the outcome of this litigation.

## DOCUMENTS CONSIDERED

8.      In forming the opinions expressed in this Declaration, I considered U.S. Patent No. 7,016,481 ("the '481 patent") and U.S. Patent No. 7,139,371 ("the '371 patent"), and their respective file histories. I also considered the file history of U.S. Patent No. 6,859,525 ("the '525 patent"). The '481 patent application is a "continuation-in-part" ("CIP") of the '525 patent. A copy of the '481 patent and its prosecution history are attached hereto as Exhibits 2 and 3,

respectively.  A copy of the '371 patent and its file history are attached hereto as Exhibits 4 and 5, respectively.  A copy of the file history of the '525 patent is attached hereto as Exhibit 6.

9.    I have also reviewed the parties' respective Proposed Claim Constructions.  A copy of each of the parties' Proposed Claim Constructions are attached hereto as Exhibits 7, 8, and 9

### OVERVIEW OF THE SUBJECT MATTER
### AND PROSECUTION HISTORIES OF THE PATENTS-IN-SUIT

- **Background of Plain Old Telephone Service ("POTS")**

10.    The prior art to the patents-in-suit includes telephone devices used to communicate by voice over the public switched telephone network ("PSTN").  Telephone calls over the PSTN are generally referred to as Plain Old Telephone Service ("POTS") calls.  Exhibit 2, '481 patent, col. 1, line 9-13.

11.    The basic components of a cordless POTS telephone device include a telephone handset and a base unit.  The telephone handset has several components, including a microphone for a user to speak into, a speaker for the user to hear audio communications, and a handset keypad.  The telephone handset communicates with the base unit via radio frequency signals, commonly referred to as RF signals.

12.    In operation, a user presses number keys on the keypad to dial a telephone number.  Pressing number keys on the keypad causes circuitry within the handset to generate dual tone multi frequency tones.  Dual tone multi frequency tones are commonly referred to as DTMF tones.    Exhibit 10, Newton's Telecom Dictionary, p. 400-02 (10th Ed. 1996) (USR000003 – 6); Exhibit 11, Microsoft Computer Dictionary, p. 166 (4th Ed. 1999); Exhibit 12, Glossary of Telecommunications Terms, p. D-32 (1996) (USR000001 – 2); Exhibit 13, The Authoritative Dictionary of IEEE Standards Terms, p. 340-341 (7th Ed. 2000); Exhibit 14,

Modern Dictionary of Electronics, p. 294-295 (6th Ed. 1997).  A DTMF tone is a combination of one high tone and one low tone for conveying information about which number on a keypad has been pressed.  *Id.*  For example, each key on the keypad has a unique DTMF tone that is generated when the key is pressed by the user.  *Id.*  The handset transmits the DTMF tone to the base unit via RF signals.  The base unit then conveys the DTMF tones over an audio pathway to a Central Office.  The Central Office within the PSTN detects the DTMF tones in the audio pathway, and based on the DTMF tones received, the Central Office routes the telephone call to a specific phone in the system.  To ensure proper detection by the Central Office of the PSTN, the DTMF tone must comply with a Dual-Tone Multi-Frequency standard.  Exhibit 15, Telecommunication Standardization Sector of the International Telecommunications Union ("ITU-T"), Q-Series Publications, Recommendation Q.23, http://www.itu.int/rec/T-REC-Q.23-198811-I/en (USR000301 – 304); Exhibit 16, U.S. Pat. No. 6,650,662 ("The CCITT recommendation Q.23 defines the characteristics of the DTMF signalling [*sic*] in term of frequencies (to generate a tone), as well as in term [*sic*] of tolerance"); Exhibit 17, DialABC, "DTMF Tones," http://www.dialabc.com/sound/dtmf.html. ("DTMF 'Touch' Tones are defined in CCITT Volume VI: *General Recommendations on Telephone Switching and Signalling Recommendation Q.23: Technical Features of Push-Button Telephone Sets.*").

13.    The users can then conduct their telephone conversation by speaking into the microphone of the telephone handsets.  Their voice signals are transmitted over the same audio pathway in which the audible DTMF tones were transmitted.  The users are able to hear each others' voices though the speakers contained in the telephone handsets.

- **Background of the Technology of the Patents-in-Suit**

14.    The '481 patent is titled "Remote Internet Telephony Device."  The '371 patent is also titled "Remote Internet Telephony Device."  The '371 patent is a continuation of the '481 patent and has the same written description and drawings as the '481 patent.

15.    The telephone device described in the patents-in-suit is for emulating a POTS call over a digital telephony network (*i.e.*, the Internet).  The patents-in-suit describe a cordless telephone handset and base unit combination, with the base being in wired communication with a personal computer ("PC"), which in turn is connected to the Internet.  Fig. 3 from the patents-in-suit is illustrative, and an annotated version of Figure 3 is reproduced below.



Exhibit 2, Fig. 3 (USR000011).

16.    The specifications of the patents-in-suit explain that the "remote Internet Telephony appliance . . . consists of a PC 100, [c]ordless handset base unit 105 and a cordless

5

handset 107." *Id.* at col. 3, line 2-4 (USR000033). As shown in Figure 1, the PC is connected to the Internet. *Id.* at Fig. 1 (USR000009).

17.     As shown in Figure 4 of the patents-in-suit (excerpt of figure shown below), the remote cordless telephone handset has several components, including a microphone (420) for the user to speak into, a speaker (430) for the user to hear audio communications, a DTMF keypad and internal circuitry (307) for generating DTMF tones when a user presses a key on the keypad, and a radio frequency transceiver (401) for wireless communication with the remote base unit. *Id.* at Fig. 4 ( USR000012).



18.     Figure 4 (excerpt shown below) also shows that the base unit has several components, including a radio frequency transceiver (451) for wireless communication with the telephone handset, and circuitry (460, 470, 480) for relaying audio information between the handset to the personal computer.



19.    The base unit connects to the PC (100) via a sound card and an input/output ("I/O") port.  *Id.* at col. 1, line 53-56 (USR000032).  An annotated excerpt from Figure 4 illustrating the connection between the base unit and the PC is shown below:



20.    The connection to the sound card allows analog audio signals, such as voice communication and DTMF tones to be transmitted between the base unit and the PC. *Id.* at col. 3, line 7-15, 34-39, 59-67 and col. 4, line 16-19 (USR000033).  The connection to the I/O port

allows data, such as control and status signals to be transmitted between the PC and the base unit. *Id.* at col. 3, line 11- 19, 34-39 and col. 4, line 10-15 (USR000033). An RS232 I/O port, for example, as shown in Fig. 4, is a standard I/O port for transferring serial binary communications.

21.     The PC contains software that allows the telephonic device to emulate POTS calls over the Internet, which requires, among other things, the determination of whether information received from the telephone handset is a DTMF tone or a voice signal from a user. The specifications of the patents-in-suit explain that "emulation of the POTS user experience" requires the software "to sense[] off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls." Exhibit 2, '481 patent, col. 2, line 4-8 (USR000032).

22.     In operation, a user presses the number keys on the keypad to dial a telephone number. Pressing number keys on the keypad causes circuitry within the handset to generate DTMF tones. *Id.* at col. 4, line 29-35 (USR000033). The DTMF tones are sent to the handset transceiver, which then sends the DTMF tones to the remote cordless base unit as audio information. The transceiver sends the DTMF audio information to the base unit via RF signals. Alternatively, the DTMF tones may be packaged as data at the handset and rendered into DTMF tones at the base unit. *Id.* at col. 6, line 37-41 (USR000034).

23.     The base unit transmits the DTMF audio information to the PC via the sound card. Exhibit 2, '481 patent, col. 1, line 53-56 (USR000032). The software contained on the PC processes the audio information to emulate a POTS call over the Internet, which requires determining whether the audio information received is a DTMF tone or a voice signal. *Id.* at col. 2, line 4-8 (USR000032). The PC then sends the processed information through the Internet to a

gateway that is connected to both the Internet and the Public Switched Telephone Network ("PSTN"), which routes the telephone call to a specific phone in the system.

- **Prosecution History of the '481 Patent**

24.     The '481 patent application was filed in the United States Patent and Trademark Office ("USPTO") on December 11, 2000.

25.     The '481 patent application is a "continuation-in-part" ("CIP") of the '525 patent, but is directed to a different device.  Unlike the '525 patent, which describes a handset having a wired connection to a personal computer or PC, the '481 patent application describes a cordless handset and base unit combination, with the base unit being in wired communication with a PC.

26.     In a May 7, 2004 office action, the examiner rejected originally filed claims 1, 4, 5 and 15, but indicated that dependent claims 2, 3 and 6-14 would be allowable if rewritten in independent form.  Exhibit 3, Office Action dated May 7, 2004 at p. 2 (USR000091).  In an August 26, 2004 amendment, the applicant amended original claim 1 to include the limitations of original claim 9, amended claims 4 and 5 to correct a formal matter, canceled original claim 9, and added two new claims.  *Id.*, Response to First Office Action, pgs. 1-2 (USR000099 – USR000100).  Because the patent examiner indicated that the prior art of record purportedly did not disclose a device with a PC having software to allow emulation of a cordless POTS telephone call over the Internet, the applicant amended claim 1 to include: "wherein said software is compatible with telephony software utilized by Internet telephony providers so as to allow emulation of a cordless POTS telephone call over the Internet." *Id.*

27.     Notes of a July 28, 2005 examiner interview suggest that the amendment was misplaced by the USPTO, resulting in an erroneous abandonment of the application.  *Id.*, Interview Summary (USR000119).  In a Notice of Allowance mailed on September 26, 2005, the

examiner made amendments similar to those submitted by the applicant on August 26, 2004. *Id.*, Notice of Allowance, pgs. 1-3 (USR000114 – 117). Some (but not all) claim amendments submitted by the applicant on November 22, 2005 were made by the USPTO before the '481 patent issued on March 21, 2006.

- **Prosecution History of the '371 Patent**

28.    The '371 patent application was filed in the USPTO on December 13, 2005 as a continuation of the '481 application.

29.    All claims of the '371 patent application were rejected in a March 16, 2006 office action. Exhibit 5, Office Action dated March 16, 2006, p. 1 (USR000241). The examiner rejected original claim 1 based on double patenting over claim 1 of the '481 application. Original claims 1-7 and 14-16 were rejected as anticipated by U.S. Patent No. 6,826,174 to Erekson *et al.* (hereinafter "Erekson"). *Id.* at p. 4 of the Office Action dated March 16, 2006 (USR000244). Original claim 8 was rejected as obvious over Erekson, and original claim 1 was further rejected as obvious over U.S. Patent No. 6,728,546 (Peterson et al.) in view of Erekson. *Id.* at pgs. 7-9 the Office Action dated May 16, 2006 (USR000247 – 248).

30.    In a May 16, 2006 amendment, the applicant made several statements and amendments in an attempt to distinguish its alleged invention over the prior art. In particular, the applicant added the word "direct" to the limitation explaining the connection between the PC and the digital telephony network:

> 2. Please amend Claim 1 by adding the word "direct", changing "and a computer having a connection to a digital telephony network" to "and a computer having a <u>direct</u> connection to a digital telephony network".

*Id.*, Response to Office Action mailed March 16, 2006, p. 1 (USR000256).  In addition, the applicants indicated that the amendment was being made to distinguish the alleged invention from Erekson:

> Voice modem...can cause massive user confusion" (Specification, Page 2 lines 5-6).  In Applicants' view, Claim 1 (from which the other claims depend) is distinguishable from Erekson, in that it provides for "a computer having a connection to a digital telephony network..." (Page 13, line 18) while the Erekson disclosure provides a computer connected to a specialized modem (which is not a part of a digital telephony network).  Accordingly, Applicants believe the claims are allowable over Erekson.  In order to highlight this distinction, and  in the interest of promptly concluding prosecution of the pending application Applicants are amending Claim 1, changing the referenced language to "a computer having a direct connection to a digital telephony network..." so as to  avoid an interpretation that would encompass connection to a digital telephony network through a specialized modem as described in Erekson.

*Id.* at p. 2 of the Response to Office Action mailed March 16, 2006 (USR000257).

31.    As a result of applicant's statements and amendment, the PTO allowed the application and stated: "Erekson does not teach or suggest a computer having a direct connection to a digital telephone network . . . ."  *Id.*, Notice of Allowability, p. 2 (USR000270).

## THE LAW OF CLAIM CONSTRUCTION

32.    I understand that claim construction is a matter for the court to decide, based on a consideration of the intrinsic evidence of record consisting of the patent itself, including the claims, the specification, and the prosecution history (*i.e.*, the record of the proceedings before the Patent Office).

33.    I further understand that claim construction begins with determining the ordinary and customary meaning, if any, which would be attributed to a claim term by a person of ordinary skill in the art.

34.    I also understand that the focus is on the objective test of what a person of ordinary skill in the art at the time of the invention would have understood the term to mean.  In my opinion, a person having ordinary skill in this art at the time the '481 patent was filed would

have at least four years formal education in electrical engineering and at least four years experience in the design of peripherals for use in personal computers (*i.e.*, external devices connected to PCs to provide addition functionality, such as mice, keyboards, headsets, cameras, etc.).

35.    A patentee may choose to be his own lexicographer and use terms in an unconventional manner so long as the special meaning of the term is stated in the patent specification or the prosecution history.  A claim term must be given the same interpretation whenever it is employed in the claims – the meaning of a claim term should not vary from claim element to claim element or from claim to claim.

36.    In addition, I understand that claims are a part of the specification and must be read in view of the entire specification, including the written description of the invention.  The written description of the invention must be clear and complete enough to enable those of ordinary skill in the art to make and use it.  The specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

37.    I understand, however, that in attempting to determine the ordinary meaning of claim terms, other sources available to the public that show what a person of skill in the art would have understood disputed claim terms to mean can be considered.  Those sources include extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art, such as technical dictionaries and industry-wide standards.

38.    I further understand that the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.  Moreover,

arguments made during prosecution of a patent application are given the same weight as claim amendments.

39.    I also understand that the claims of a patent may include limitations reciting a "means" for performing a specific "function."  These limitations are referred to as "means-plus-function" limitations.  Construing a means-plus-function limitation involves two steps.  First, the court identifies the claimed function and then construes the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations. I understand that ordinary principles of claim construction govern the interpretation of the claim language used to describe the function.  Therefore, after identifying the claimed function, the court determines what structure, if any, disclosed in the specification corresponds to the claimed function.  In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate or link the structure with performance of the function.

### INTERPRETATION OF THE '481 PATENT AND THE '371 PATENT – RELEVANT DISPUTED CLAIM LIMITATIONS

40.    I understand that the Court has not yet construed the asserted claims of the '481 patent and the '371 patent.  I address what I believe to be the proper constructions of the relevant claim terms in dispute.

#### A.    "remote cordless telephone handset" and "remote cordless base unit" – *Claim 1 of the '481 Patent and Claim 1 of the '371 Patent*

41.    Claim 1 of the '481 patent and claim 1 of the '371 patent require a "remote cordless telephone handset" and a "remote cordless base unit."   In my opinion, the phrase "remote cordless telephone handset" means a cordless telephone handset that communicates with a cordless base unit via radio frequency signals.  The phrase "remote cordless base unit" means a

13

cordless base unit that communicates with the cordless telephone handset via radio frequency signals.

42.    The specifications and figures of the patents-in-suit indicate that the "remote cordless telephone handset" is a wireless device a user may hold in his or her hand and use to speak and hear voice communication, and which communicates wirelessly via radio frequency signals with a separate "remote cordless telephone base unit."  For example, the specifications of the patents-in-suit state: "the Base 105 and Handset 107 communicate using standard 900 mhz radios . . . ."  Exhibit 2, '481 patent, col. 3, line 5-6 (USR000033); Exhibit 4, '371 patent, col 3, line 7-9 (USR000178).  The figures of the patents-in-suit also indicate that the cordless telephone handset and the cordless base unit communicate wirelessly via radio frequency signals.  For example, annotated version of Figure 3 is reproduced below.



43.    In addition, Claim 1 in each of the patents-in-suit lists several elements that the telephone handset and base unit must include, which indicate that the telephone handset and base unit are in wireless rf communication.  For example, claim 1 states that the telephone handset must include "a microphone, a speaker, a dialpad, a handset rf transceiver for communication with a base unit transceiver, circuitry for translating audio information input to said microphone to an *rf signal* as an input to said handset rf transceiver, [and] circuitry for translating input from said handset rf transceiver means to an electrical signal as an input to said speaker."  Exhibit 2, '481 patent, col. 7, line 32-39 (USR000035); Exhibit 4, '371 patent, col. 7, line 36-45 (USR000180) (emphasis added).  Similarly, the base unit must include "a base unit *rf transceiver* for communication with said handset *rf transceiver* . . . ."  Exhibit 2, '481 patent, col. 7, line 44-45 (USR000035); Exhibit 4, '371 patent, col. 7, line 47-48 (USR000180) (emphasis added).

- **"circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver" –** *Claim 1 of the '481 Patent and Claim 1 of the '371 Patent*

44.    This limitation is also found in claim 1 of the '481 patent and claim 1 of the '371 patent.  The phrase "circuitry for translating audio information input to said microphone to an rf signal as an input to said handset rf transceiver" means circuitry that converts the audio signal input to the microphone into radio frequency signals which are then input into the radio frequency transceiver means.

45.    The plain and ordinary language of claim 1 indicates that the audio information spoken by the user is "input into the microphone."  The audio information is then translated "to an rf signal" by circuitry in the handset.  After the circuitry translates the audio information, the audio information – in the form of rf signals - is input into the handset rf transceiver.  Thus, the

circuitry in the telephone handset converts the audio information from the microphone into radio frequency signals *before* being input into the radio frequency transceiver.

- **"circuitry for translating a keypress on said dialpad into a DTMF tone as an input to said handset rf transmitter" –** *Claim 1 of the '481 Patent*

46.     This limitation is found in claim 1 of the '481 patent.  The phrase "DTMF tone" means a combination of high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for indicating which key on a keypad has been pressed.  The term "DTMF" is well known to those of ordinary skill in the art as an abbreviation for "dual tone multi frequency."  *See* Exhibit 10, Newton's Telecom Dictionary, p. 400-02 (10th Ed. 1996) (USR000003 – 6); Exhibit 11, Microsoft Computer Dictionary, p. 166 (4th Ed. 1999); Exhibit 12, Glossary of Telecommunications Terms, p. D-32 (1996) (USR000001 – 2); Exhibit 13, The Authoritative Dictionary of IEEE Standards Terms, p. 340-341 (7th Ed. 2000); Exhibit 14, Modern Dictionary of Electronics, p. 294-295 (6th Ed. 1997). As also known throughout the art, "dual tone multi frequency" refers to a combination of high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for indicating which key on a keypad has been pressed.  *Id.*; Exhibit 15, Telecommunication Standardization Sector of the International Telecommunications Union ("ITU-T"), Q-Series Publications, Recommendation Q.23, (USR000301 – 304), http://www.itu.int/rec/T-REC-Q.23-198811-I/en; Exhibit 17, DialABC, "DTMF Tones," http://www.dialabc.com/sound/dtmf.html. ("DTMF 'Touch' Tones are defined in CCITT Volume VI: *General Recommendations on Telephone Switching and Signaling Recommendation*

*Q.23: Technical Features of Push-Button Telephone Sets.*")[1].  As recognized by those skilled in

the art at the time of the filing the patents-in-suit, the prior art explains:

> [F]or voice connections, some control signals such as Dual-Tone MultiFrequency
> (DTMF) signals, which have different characteristics than voice traffic, may be
> transmitted over the network.  The signal frequencies are geometrically spaced
> and are not harmonically related. *The CCITT recommendation Q.23 defines the
> characteristics of the DTMF signalling* [*sic*] *in term of frequencies (to generate a
> tone), as well as in term* [*sic*] *of tolerance.*

Exhibit 12, U.S. Pat. No. 6,650,662, col. 2, ll. 36 – 55, emphasis added.

47.    Therefore, the plain and ordinary meaning of the phrase "circuitry for translating

a keypress on said dialpad into a DTMF tone as an input to said handset rf transmitter" is that the

telephone handset has circuitry that converts a key press on the dialpad into a combination of

high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT

Recommendation Q.23) as an input to the handset rf transmitter means.

48.    Furthermore, the specification of the '481 patent confirms that the term "DTMF"

is used in claim 1 consistent with its plain and ordinary meaning.  For example, the specification

of the '481 patent states:

- "A specialized cordless telephone is provided with the means to . . . transport
  audio, control and DTMF tones to a standard PC soundcard and I/O port."
  Exhibit 2, '481 patent, col. 1, line 53-56 (USR000032).

- "The combined hardware and software portions allow Internet Telephony
  applications to sense, off hook, issue a dial tone, receive DTMF tones, and
  provide audible remote ring for an outbound call, as well as ring and connect
  inbound calls." *Id.* at col. 2, line 3-7 (USR000032).

---

[1]  The ITU-T was formerly the known as CCITT, therefore the ITU-T Recommendation Q.23 is interchangeably
referred to as "CCITT Recommendation Q.23" throughout the telecommunications art.  See, e.g., U.S. Pat. No.
6,650,662 ("The CCITT recommendation Q.23 defines the characteristics of the DTMF signalling [*sic*] in term of
frequencies (to generate a tone), as well as in term [*sic*] of tolerance"); U.S. Pat. No. 7,184,542 ("The characteristics
of DTMF tones are well known in the field of telecommunications and are defined in ITU-T recommendations Q.23
and Q.24.").  In addition, Recommendation Q.24 depends from Q.23; See Exhibit 14 (Q.24 states "[e]ach signal
consists of two frequencies taken from two mutually exclusive frequency groups (a high group and a low group) of
four frequencies each, as specified in Recommendation Q.23. These frequencies and their allocation to form the
various digits and symbols of the push-button signalling [*sic*] code are defined in Recommendation Q.23.").

- "[T]he remote handset . . . may be used to trigger events and programs via DTMF tones . . . ." *Id.* at col. 2, line 9-11 (USR000032).

- "The User then proceeds with the call by dialing a number on DTMF Keypad 307 which is scanned by HS Control Chip 425 and transmitted as audio through HS RF Module 401 and RF Communications 106 to Base 105." *Id.* at col. 4, line 29-32 (USR000033).

- Reliability scoring ranged from 0 (no detection) to 10 (perfect), and was used to determine that the Primary/Harmonic ratio (which would separate DTMF from similar sounds such as music) could not be used on all PC sound systems. *Id.* at col. 6, line 5-9 (USR000034).

- "DTMF detected . . . assemble number until # (send) key then release audio input" *Id.* at Fig. 2, block 207 (USR000010).

- "[s]ample listing for setup of DTMF recognition and serial port operations related to use of the Cordless Internet Telephone to emulate a POTS call . . ." *Id.* at Fig. 6, first line of program (USR000014).

- "FIG. 8 is a listing of the C code for the DTMF detection library function after optimization. This library function can be called by any user program to detect digits, and runs continuously until stopped." *Id.* at col. 6, lines 12-15 (USR000034).

49.     Also, Figure 4 of the '481 patent shows that "DTMF" is an output from "307 DTMF keypad." An annotated excerpt from Figure 4 is shown below.



- **"said remote cordless telephone base unit connected to a computer"**

50.     This limitation is found in claim 1 of the '481 patent and claim 1 of the '371 patent.

51.     The only type of computer described by the specifications of the patents-in-suit is a personal computer ("PC").   As clearly indicated in the Summary of the Invention of the patents-in-suit: "A specialized cordless telephone is provided with the means to signal device ready status, trigger a standard telephone ring, and transport audio, control and DTMF tones to a *standard PC soundcard* [*sic*] *and I/O port*."   Exhibit 2, '481 patent, col. 1, line 53-56 (USR000032); Exhibit 4, '371 patent, col. 1, line 56-59 (USR000177).

52.     Figure 4 of the patents-in-suit is illustrative, and an annotated version of Figure 4 is shown below:



53.     Furthermore, Figure 3 of the patents-in-suit also clearly shows the computer being a PC.  In describing Figure 3, the specifications state: "Fig. 3 [d]epicts a preferred embodiment where PC 100 connects to the specialized handset base 105 . . . ."  Exhibit 2, '481 patent, col. 3, line 59-60 (USR000033); Exhibit 4, '371 patent, col. 3, line 61-62 (USR000178).   The

specifications further explain that "[a] remote Internet telephony appliance . . . consists of a PC 100, [c]ordless handset base unit 105 and cordless handset 107." Exhibit 2, '481 patent, col. 3, line 1-4 (USR000033); Exhibit 4, '371 patent, col. 3, line 4-7 (USR000178).

54.    Therefore, the specifications of the patents-in-suit make it clear that the phrase "said remote cordless telephone base unit connected to a computer" means that the remote cordless telephone base unit is in electronic communication with a personal computer ("PC") via an I/O port and a sound card.

- **"means for determining whether said communication represents a DTMF signal or audio information" – *Claim 1 of the '481 Patent***

55.    This limitation is found in claim 1 of the '481 patent. This limitation is written in means-plus-function form. Because the limitation is in means-plus-function form, it is first necessary to identify the function recited in the limitation. The recited function is: "determining whether said communication represents a DTMF signal or audio information." The plain and ordinary meaning of the phrase "DTMF signal" is a combination of high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for indicating which key on a keypad has been pressed. Exhibit 10, Newton's Telecom Dictionary, p. 400-02 (10th Ed. 1996) (USR000003 – 6); Exhibit 11, Microsoft Computer Dictionary, p. 166 (4th Ed. 1999); Exhibit 12, Glossary of Telecommunications Terms, p. D-32 (1996) (USR000001 – 2); Exhibit 16, U.S. Pat. No. 6,650,662, col. 2, ll. 36 – 55;Exhibit 17, DialABC, "DTMF Tones," http://www.dialabc.com/sound/dtmf.html. ("DTMF 'Touch' Tones are defined in CCITT Volume VI: *General Recommendations on Telephone Switching and Signalling Recommendation Q.23: Technical Features of Push-Button Telephone Sets.*").

56.    Next, I identified the structures disclosed in the specification that correspond to the means for determining whether said communication represents a DTMF signal or audio

information.  In this regard, the specification of the '481 patent fails to disclose or clearly link any structure contained in the base unit to the function of "determining" whether the communication is a DTMF signal or audio information.  Other than being recited in claim 1, the term "determining" is nowhere to be found in the '481 specification or prosecution history.

57.    The only possible structure in the base unit that could be arguably associated with the claimed function is the "110 DTMF Decode" box shown in Figure 1.  Neither the specification nor the figures of the '481 patent provide an explanation for the "DTMF decode" box.  There is no explanation of what the "DTMF Decode" is, how it works, or how it is constructed.  The specification does not provide any disclosure of any circuit, microprocessor with operating software, or any such apparatus associated with the what is labeled as "110 DTMF Decode."

58.    Also, the term "decoding" DTMF suggests something different than determining whether a communication from a handset represents a DTMF signal or an audio signal as required by claim 1 of the '481 patent.  Specifically, "decoding" suggests converting a DTMF signal into some other type of information (*e.g.*, a number on a keypad).  Conversely, the claimed function of "determining" whether a handset communication represents a DTMF signal or an audio signal requires determining whether a particular signal is a DTMF tone or is instead some other type of audio information.  Stated differently, "decoding" DTMF suggests determining what a DTMF tone represents, while the claimed function requires "determining" if a DTMF tone is even present.  Furthermore, the Specification is clear that any "determining" step in regards to DTMF tones would be performed by software running on the PC, not at the cordless base unit as required by the claim.  As discussed above, the base unit transmits the DTMF audio information to the PC via the sound card.  Exhibit 2, '481 patent, col. 1, line 53-56

(USR000032). The software contained on the PC processes the audio information to emulate a POTS call over the Internet, which requires determining whether the audio information received is a DTMF tone or a voice signal. *Id.* at col. 2, line 4-8 (USR000032).

59.    I have reviewed Riparius' proposed claim construction for this limitation. I disagree with Riparius' assertion that "a Base RF Module 451 and a Base Control Chip 470" correspond to the means for determining whether said communication represents a DTMF signal or audio information. Reading the specification of the '481 patent, one of ordinary skill in the art would not identify "a Base RF Module 451 and a Base Control Chip 470" as corresponding to the claimed function of "determining" whether the communication is a DTMF signal or audio information for several reasons:

- The "Base RF Module 451" and the "Base Control Chip 470" are not clearly linked or associated with "determining" whether the communication is a DTMF signal or audio information.

- The "Base RF Module 451" and the "Base Control Chip 470" disclosed in the specification appear to be only general references to microchips with very basic circuitry. There is nothing in the specification explaining how one would make or use the "Base RF Module 451" and "Base Control Chip 470" to determine whether said communication represents a DTMF signal or audio information.

- The specification does not disclose any algorithms that could be utilized by the "Base RF Module 451" and "Base Control Chip 470" to determine whether said communication represents a DTMF signal or audio information.

- The "Base RF Module 451" and "Base Control Chip 470" already have other functions to which they are clearly linked. For example, the "Base RF Module 451" decodes compressed audio signals before transmission to the PC. Specifically, "[t]he Base Compander 460 compresses the audio stream and forwards it to the Base RF Module 451 via Audio In 452…and [t]he Base RF Module 451 decodes the Audio Out 453 which is expanded in Base Compander 460 and sent to the PC 100 via Audio Out 466." Exhibit 2, '481 patent, col. 4, line 19-21 and 32-35. "Base RF module 451" may also communicate the loss of the carrier signal "via carrier line to Base Control Chip 470." *Id.* at col. 4, line 58-61. Likewise, the "Base Control Chip 470" transmits commands to the "Base RF module 451. For example, "Base Control Chip 470 sends a ring command via Data 475 line to the Base RF Module 451." *Id.* at col. 5, line 12-14. The Base

Control Chip 470, however, does not demodulate or interpret the ring command, but rather "[t]he ring command is demodulated by Handset RF Module 401 and interpreted by HS Control Chip 425." *Id.* at col. 5, line 14-16. The "Base Control Chip 470" may also indicate to the PC that the phone is off-hook. *Id.* at Col. 4, line 1-12.

60.    Should the Court determine that the '481 patent sufficiently discloses structure associated with the claimed function, then the corresponding structure for "means for determining whether said communication represents a DTMF signal or audio information" should be construed to include the description at Col. 3, line 39-41 (USR000033); col. 4, line 37-52; (USR000033) col. 5, line 43 – col. 6, line 15; (USR000034) and Figs. 1, 2, 4, 6, 7, and 8 (generally describing chips, analysis, algorithms, and software)."  In addition, the phrase "said communication" means the signal transmitted between the telephone handset and the base station.  Claim 1 indicates that the communication from the telephone handset to the base unit is an audio signal – in the form of DTMF tones and voice information input into the handset microphone.  Claim 1 explains that the "DTMF signal" transmitted to the base unit is a DTMF audio tone.  Exhibit 2, '481 patent, col. 7, line 41-42 (USR000035) ("a DTMF tone as an input to said handset rf transmitter").  In operation, pressing number keys on the keypad causes circuitry within the handset to generate DTMF audio tones.  The handset transmits the DTMF audio tone to the base unit via the handset transmitter in the form of RF signals.  Specifically, the specification of the '481 patent explains: "The User then proceeds with the call by dialing a number on DTMF Keypad 307 which is scanned by HS Control Chip 425 and transmitted as audio through HS RF Module 401 and RF Communications to Base 105 . . ." Exhibit 2, '481 patent, col. 4, line 29-32 (USR000033).

61.    Claim 1 also indicates that the phrase "audio information" means voice information "input into the handset microphone".  *Id.* at col. 7, line 35-36 (USR000035)

(previously defining "audio information" as "input into the handset microphone"). In operation, users conduct their telephone conversation by speaking into the microphone of the telephone handsets. Their voices are input into the handset microphone and then transmitted as rf signals over the same audio pathway in which the audible DTMF tones are transmitted. Although it is my opinion that there is not sufficient disclosure in the specification of the '481 patent, the circuitry in the base unit then determines, based on audio characteristics of the rf signal, whether that signal is a DTMF tone or is voice information input to a handset microphone.

- **"means for transmitting signals between said base unit rf transceiver and said computer" –** *Claim 1 of the '481 Patent and Claim 1 of the '371 Patent*

62.     This limitation is found in claim 1 of the '481 patent and claim 1 of the '371 patent. This limitation is written in means-plus-function form. Because the limitation is in means-plus-function form, I first identified the function recited in the limitation. The recited function is transmitting signals between said base unit rf transceiver and said computer.

63.     Next, I identified the structures disclosed in the specification that correspond to the means for transmitting signals between said base unit rf transceiver and said computer. In this regard, the only type of connection between the PC and the base unit described by the specifications of the patents-in-suit is via a sound card and I/O port. The specifications state: "A specialized cordless telephone is provided with the means to signal device ready status, trigger a standard telephone ring, and transport audio, control and DTMF tones *to a standard PC soundcard* [*sic*] *and I/O port*." Exhibit 2, '481 patent, col. 1, line 53-56 (USR000032); Exhibit 4, '371 patent, col. 1, line 56-59 (USR0000177) (emphasis added). Figure 4 of the patents-in-suit is illustrative, and an annotated version of Figure 4 is shown below:



64.    The specifications disclose several structures for transmitting signals between the base unit and the PC sound card and I/O port.  Corresponding structures for transmitting signals between the base unit and the communication I/O port of the PC include any of the following and their equivalents: (1) USB port; (2) I/O port; and (3) standard RS232 port.  Exhibit 2, '481 patent, col. 1, lines 56-60 (USR000032); col. 4, line 1-3 (USR000033); Fig. 4 (USR000012); Exhibit 4, '371 patent, col. 1, line 59-63 (USR000177); col. 4, line 3-5 (USR000178); Fig. 4(USR000154).  Corresponding structures for transmitting analog audio signals between the base unit and sound card of the PC include any of the following and their equivalents: (1) standard PC sound card; (2) audio out port; and (3) audio in port.  Exhibit 2, '481 patent, col. 1, lines 56-60 (USR000032); col. 3, line 59-64 (USR000033); Fig. 4 (USR000012); Exhibit 4, '371 patent, col. 1, line 56-59 (USR000177); col. 3, line 59-66 (USR000178); Fig. 4 (USR000154). Therefore, the proper construction of the limitation is "transmitting signals between the base unit rf transceiver and the communication I/O port and sound card of the PC."

- **"said software is compatible with telephony software utilized by Internet telephony providers so as to allow emulation of a cordless POTS telephone call over the Internet" – *Claim 1 of the '481 Patent and Claim 1 of the '371 Patent***

65.    This limitation is found in claim 1 of the '481 patent and claim 1 of the '371 patent.  The specifications of the patents-in-suit specifically define what it means to "emulate" a POTS telephone call.  According to the specifications, "emulation" of a POTS call means "to sense, off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls."  Exhibit 2, '481 patent, col. 2, line 3-7 (USR000032); Exhibit 4, '371 patent, col. 2, line 6-10 (USR000177).  The specifications clearly explain that this functionality "allows for full emulation of the POTS line user experience."  Exhibit 2, '481 patent, col. 2, line 7-8 (USR000032); Exhibit 4, '371 patent, col. 2, line 10-11 (USR000177).

66.    The specifications also state: "Fig. 2 is a flow chart of the interaction of software and hardware to *emulate* POTS line operation."  Exhibit 2, '481 patent, col. 2, line 39-40 (USR000032); Exhibit 4, '371 patent, col. 2, line 42-43 (USR000177) (emphasis added).  Figure 2 in each of the specifications also indicate that DTMF generation and detection is required for emulating a POTS call.  An annotated excerpt from Figure 2 is shown below.



67. The specifications further explain that "[i]n Fig. 2 the progress of the software to *emulate a POTS call* is depicted . . . Upon detection of a change in Status Out 103, the program triggers Windows to . . . engage Audio In 102 monitoring 206 for *DTMF tones*." Exhibit 2, '481 patent, col. 3, line 21-39 (USR000033); Exhibit 4, '371 patent, col. 3, line 23-41 (USR000178) (emphasis added). Similarly, the description at the top of Figure 6 of the patents-in-suit states: "Sample listing for setup of DTMF recognition . . . related to use of the Cordless Internet Telephone to emulate a POTS call using one of several service providers." Exhibit 2, '481 patent, Fig. 6 (USR000014); Exhibit 4, '371 patent, Fig. 6 (USR000156).

68. Furthermore, one of ordinary skill in the art understands that for a system to "emulate" a conventional POTS call, then that system must perform all of the functions of a POTS system. The meaning of the term "emulate" is to "imitate" or "behave in the same manner." Exhibit 10, Newton's Telecom Dictionary, p. 249 (17th Ed. 2001); Exhibit 11, Microsoft Computer Dictionary, p. 166 (4th Ed. 1999); Exhibit 14, Modern Dictionary of Electronics, p. 340 (6th Ed. 1997).

69. Additionally, one of ordinary skill in the art understands that a conventional POTS system senses off hook status, issues a dial tone, uses DTMF audio tones generated from circuitry within a telephone handset to place a telephone call, and provides audible ring signals for inbound and outbound calls. One of ordinary skill in the art knows that to emulate a POTS system, there must be generation and transmission of DTMF tones to place a telephone call. In other words, to emulate a POTS system, the emulating system must generate and transmit a combination of high and low audio tones complying with the Dual-Tone Multi-Frequency standard (CCITT Recommendation Q.23) used for indicating which key on a key pad has been

pressed.  Therefore, in sum, this limitation means "the software causes the claimed device to emulate a POTS telephone by the ability to sense whether the phone is off hook, issue a dial tone, receive DTMF tones, and provide audible remote ring for an outbound call, as well as ring and connect inbound calls."

- **"circuitry for translating a keypress on said dialpad into data representing said keypress as an input to said handset rf transmitter" –** *Claim 1 of the '371 Patent*

70.    This limitation is found in claim 1 of the '371 patent.  This limitation means circuitry that converts a key press on the dialpad into data representing a DTMF tone as an input to the handset rf transceiver means.  The only type of dialpad described by the specification of the '371 patent is a DTMF keypad.  The specification also indicates that data representing a key press means data representing a DTMF tone.  Specifically, upon pressing number keys on the keypad, circuitry within the handset generates DTMF tones.  Exhibit 4, col. 4, line 31-37 (USR000178).  The DTMF tones are sent to the handset transceiver, which then sends the DTMF tones to the remote cordless base unit as audio information.  The transceiver sends the DTMF audio information to the base unit via RF signals.  *Id.*  Alternatively, the DTMF tones may be packaged as data at the handset and rendered into DTMF tones at the base unit.  Id. at line 37-42 The specification further explains: "the remote handset . . . may be used to trigger events and programs via DTMF tones . . . ."  *Id.* at col. 2, line 12-14 (USR000177).  Therefore, in each and every embodiment disclosed in the specification, pressing a key on the dialpad results in the generation of DTMF tones, thus any data representing a key press must be data representing a DTMF tone.

- **"means for determining whether said communication represents data representing a keypress or audio information" – *Claim 1 of the '371 Patent***

71.    This limitation is contained in claim 1 of the '371 patent.  This limitation is written in means-plus-function form.

72.    Because the limitation is in means-plus-function form, I first identified the function recited in the limitation.   The recited function is "determining whether said communication from the handset represents data representing a key press [*i.e.*, DTMF tones] or audio information [*i.e.*, information input into the handset microphone]."  The specification of the '371 patent indicates that the "data representing a keypress" is DTMF information.  *Id.* at col. 4, line 31-43 (USR000178).   Additionally, claim 1 makes it clear that the phrase "audio information" means voice information "input into the handset microphone".  *Id.* at col. 7, line 38-40 (USR000180) (previously defining "audio information" as "input into the handset microphone").

73.    Next, it is necessary to identify the structures disclosed in the specification that correspond to the means for "determining."   In this regard, the specification of the '371 patent fails to disclose or clearly link any structure contained in the base unit to the function of "determining" whether said communication from the handset represents data representing a key press - *i.e.*, DTMF tones - or audio information - *i.e.*, information input into the handset microphone.  In fact, other than being recited in claim 1, the term "determining" is nowhere to be found in the '371 specification.  Also, the term "decoding" DTMF suggests something different than determining whether said communication from the handset represents data representing a key press - *i.e.*, DTMF tones - or audio information - *i.e.*, information input into the handset microphone, as required by claim 1 of the '371 patent.  Specifically, "decoding" suggests converting a DTMF signal into some other type of information (*e.g.*, a number on a keypad).

Conversely, the claimed function of "determining" requires determining whether a particular signal is a DTMF tone or is instead some other type of audio information. Stated differently, "decoding" DTMF suggests determining what a DTMF tone represents, while the claimed function requires "determining" if a DTMF tone is even present.

74.    I have reviewed Riparius' proposed claim construction for this limitation. I disagree with Riparius' assertion that "a Base RF Module 451 and a "Base Control Chip 470" correspond to the means for "determining." Reading the specification of the '371 patent, one of ordinary skill in the art would not identify "a Base RF Module 451 and a Base Control Chip 470" as corresponding to the claimed function of "determining" whether said communication from the handset represents data representing a key press or audio information.

- The "Base RF Module 451" and the "Base Control Chip 470" are not clearly linked or associated with "determining" whether said communication from the handset represents data representing a keypress or audio information.

- The "Base RF Module 451" and the "Base Control Chip 470" disclosed in the specification appear to be only general references to microchips with very basic circuitry. There is nothing in the specification explaining how one would make or use the "Base RF Module 451" and "Base Control Chip 470" to determine whether said communication from the handset represents data representing a keypress or audio information.

- The specification does not disclose any algorithms that could be utilized by the "Base RF Module 451" and "Base Control Chip 470" to determine whether said communication from the handset represents data representing a key press or audio information.

- The "Base RF Module 451" and "Base Control Chip 470" already have other functions to which they are clearly linked. For example, the "Base RF Module 451" decodes compressed audio signals before transmission to the PC. Specifically, "[t]he Base Compander 460 compresses the audio stream and forwards it to the Base RF Module 451 via Audio In 452…and [t]he Base RF Module 451 decodes the Audio Out 453 which is expanded in Base Compander 460 and sent to the PC 100 via Audio Out 466." Exhibit 4, '371 patent, col. 4, line 21–23 and 34–37. The "Base RF module 451" may also communicate the loss of the carrier signal "via carrier line to Base Control Chip 470." Id. at col. 4, line 60–62. Likewise, the "Base Control Chip 470" transmits commands to the "Base RF module 451. For example, "Base Control Chip 470 sends a ring command via Data 475 line to the Base RF Module 451." Id. at col. 5, line 14-16. The Base Control Chip 470, however, does not demodulate or interpret the ring command, but rather "[t]he

ring command is demodulated by Handset RF Module 401 and interpreted by HS Control Chip 425." *Id.* at col. 5, line 16–18.  The "Base Control Chip 470" may also indicate to the PC that the phone is off-hook. *Id.* at col. 4, line 12–15.

75.    Should the Court, however, determine that the '371 patent sufficiently discloses structure associated with the claimed function, then the corresponding structure for "means for determining whether said communication from the handset represents data representing a keypress or audio information" should be construed to include the description at 3:41-43; 4:39-54; 5:45-6:19; and Figs. 1, 2, 4, 6, 6a through 6k, 7, 7a, 8, and 8a through 8f (generally describing chips, analysis, algorithms, and software).    In addition, the phrase "said communication" means the signal transmitted between the telephone handset and the base unit. Exhibit 4, '371 patent, col. 7, line 36-38 (USR000180).  The specification of the '371 patent indicates that the "data representing a keypress" is DTMF information.  *Id.* at col. 4, line 31-43 (USR000178).  Additionally, claim 1 indicates that the phrase "audio information" means voice information "input into the handset microphone".  *Id.* at col. 7, line 38-40 (USR000180) (previously defining "audio information" as "input into the handset microphone").

76.    In operation, pressing number keys on the keypad causes circuitry within the handset to generate DTMF tones.  The handset transmits the DTMF tones to the base unit via the handset transmitter in the form of RF signals.  Users conduct their telephone conversation by speaking into the microphone of the telephone handsets.  Their voices are input into the handset microphone and then transmitted as rf signals over the same audio pathway in which the DTMF signals were transmitted.  The circuitry in the base unit then determines, based on audio characteristics of the rf signal, whether that signal is DTMF information or is voice information input to a handset microphone.

- **"a computer having a direct connection to a digital telephony network" – *Claim 1 of the '371 Patent***

77.    This limitation is contained in claim 1 of the '371 patent.  The phrase "direct connection" means "a connection without an intervening modem or communication mechanism."

78.    Reading the prosecution history of the '371 patent, one of ordinary skill in the art would recognize that a "direct" connection requires a connection to the "digital telephony network" *without* an intervening modem or equivalent communication mechanism.  The word "direct" was added to claim 1 during prosecution to avoid a rejection based on U.S. Patent No. 6,826,174 to Erekson et al. ("Erekson").  Response to Office Action Mailed March 16, 2006 (USR000256 – 258).   Erekson discloses several embodiments with several different types of modem connections.  For example, the systems of Erekson  "include systems with two modems, a modem and a sound card, a network interface card and a modem or sound card, or any other dual CODEC system wherein once [*sic*] CODEC is dedicated to the telephone communication and the other facilitates network communication."  Exhibit 18, col. 8, lines 56-62.  Erekson further states:

> In addition to the improved architecture [*sic*] of the dual CODEC modem, the present invention also benefits from the improved network connections available to the household user, such as G-lite DSL, aDSL, or xDSL network connections. While a user can use a standard telephone, plug it into the present invention, and make VoIP calls, through the standard PSTN or POTS connection, the more preferred network connection is a sub-rate DSL connection. A G-lite DSL connection is a sub-rate of a Digital Subscriber Link (DSL).

*Id.* at col. 4, line 34 - 43.  In addition, as shown in Figure 1 of Erekson, Erekson discloses a computer 20 using a standard modem 54 to connect to WAN 52. *See also id.* at col. 7, line 60–65.

79.    In response to the Patent Trademark Office's rejection, applicants' wrote:

> 2. Please amend Claim 1 by adding the word "direct", changing "and a computer having a connection to a digital telephony network" to "and a computer having a <u>direct</u> connection to a digital telephony network".

Exhibit 5, Response to Office Action mailed March 16, 2006, p. 4 (USR000256). In addition, the applicants indicated that the amendment was being made to distinguish the alleged invention from Erekson. The applicants wrote:

> Voice modem...can cause massive user confusion" (Specification, Page 2 lines 5-6). In Applicants' view, Claim 1 (from which the other claims depend) is distinguishable from Erekson, in that it provides for "a computer having a connection to a digital telephony network..." (Page 13, line 18) while the Erekson disclosure provides a computer connected to a specialized modem (which is not a part of a digital telephony network). Accordingly, Applicants believe the claims are allowable over Erekson. In order to highlight this distinction, and in the interest of promptly concluding prosecution of the pending application Applicants are amending Claim 1, changing the referenced language to "a computer having a <u>direct</u> connection to a digital telephony network..." so as to avoid an interpretation that would encompass connection to a digital telephony network through a specialized modem as described in Erekson.

Exhibit 5, *Id.* at p. 5 (USR000257). As a result of applicants' statements and amendment, the Patent and Trademark Office allowed the application and stated: "Erekson does not teach or suggest a computer having a direct connection to a digital telephone network . . . ." Exhibit 5, Notice of Allowance dated June 19, 2006 (USR000270).

80.    I am informed that discovery and trial preparation are ongoing. Accordingly, I reserve the right to supplement this Declaration and to rely on additional documents and testimony brought to my attention between now and the time of trial.

81.    I declare under penalty of perjury that the foregoing, to the best of my knowledge and belief is true and correct.

Date: May 8, 2008

_____
Bruce MacDowell Maggs, Ph.D.